### F. L. WILSON, Appellant v. JAMES DELANEY, Appellee.

**Contracts in restraint of trade.** A contract not to engage in a certain business at a certain place if reasonable and for a good consideration is valid.

**Same:** CERTAINTY OF CONTRACT. Conceding that an action to enforce a contract in restraint of trade is governed by the rules applicable to actions for specific performance, which require that a contract must be certain, unambiguous and free from doubt respecting the subject matter, still a contract "not to deal in stock cattle or horses" is sufficiently certain in that the business of buying and selling for gain is thereby intended; and the expression "stock cattle" involves no uncertainty in the terms, conditions and stipulations of the contract, but relates merely to an identification of the subject matter.

**Contracts in restraint of trade:** BREACH. One who has contracted to refrain from dealing in stock cattle or horses in a certain locality, except for use on his own farms but not then for speculative purposes, violates the agreement by engaging in the purchase thereof for another and rival dealer in the same locality, although he may have no financial interest therein.

*Appeal from Iowa District Court.*— HON. O. A. BYINGTON, Judge.

TUESDAY, NOVEMBER 19, 1907.

REHEARING DENIED, TUESDAY, MARCH 17, 1908.

ACTION in equity for an injunctional decree. On the filing of the petition a temporary writ issued. Trial on the merits being had, the temporary writ was dissolved, and the petition dismissed, with costs. Plaintiff appeals.— *Reversed.*

*Popham & Havner,* for appellant.

*J. M. Dower, J. B. Murphy,* and *Wade, Dutcher & Davis,* for appellee.

BISHOP, J.— The parties reside in Marengo, Iowa, county, and on and prior to October 10, 1904, the defendant had been engaged as a member of the firm of Delaney & McGiverin in the business of buying and selling live stock, horses, etc., at and in the vicinity of Marengo. On the day named defendant sold, and by appropriate writings conveyed, to plaintiff certain real estate in Iowa county, and all his interest in the personal property belonging to the firm of Delaney & McGiverin. The agreement for the sale was reduced to writing, and included in the terms thereof was this: " First party (Delaney) agrees with second party not to deal in stock, cattle or horses except for his own use on his farms, but not for speculative purpose in the stock vicinity of Marengo." This action is based on alleged violations by defendant of the provision of the agreement we have thus quoted. Out of the issues made by the pleadings, two questions arise and are presented in argument for our determination: First, as to the enforceability of the agreement as matter of law; and, if this shall be decided in the affirmative, then second, whether the acts complained of, or any of them, amounted to

a violation of the agreement such as to call for interference on the part of the court.   Of these in their order.

It is very well-settled doctrine that a contract whereby one party agrees not to engage in a certain business at a certain place will be upheld and enforced if reasonable in its

1. CONTRACTS IN
RESTRAINT
OF TRADE.

terms and based on good consideration.   So far counsel in this case do not disagree; but it is said on behalf of appellee that the action must be taken as in the nature of one for specific performance, and that the rules applicable to such actions must be held to govern.

One of these rules is that specfic performance will not be decreed either affirmatively by requiring an act to be done, or negatively by restraining the doing of an act, unless the

2. SAME: cer-
tainty of
contract.

contract is certain, unambiguous, and free from doubt respecting the subject-matter thereof. *Kirkpatrick v. Pettis,* 127 Iowa, 611.

Accepting this without discussion as a correct statement of the law applicable to the case, we may go at once to the contention for nonenforceability of the contract entered into between the parties to this suit.   The precise ground of the contention is that by the use of the expression " not to deal in stock cattle or horses," as the same occurs therein, said contract is rendered uncertain and ambiguous.   The contention is really twofold; that is, it is uncertain what was meant by saying " not to deal," and likewise in the use of the expression " stock cattle."   In our view the contention is without merit.   Speaking to the first point, it must be said that the verb "deal" has a well-defined and generally understood meaning in the world of trade.   To deal in a commodity is to negotiate or make bargains in respect of that commodity, to traffic therein as buyer or seller, or otherwise engage in mutual intercourse or transactions in respect thereto; the purpose being to accomplish a change from one to the other of interests in or title to property.   13 Cyc. 285; Webster's International Dictionary; Century Dictionary; 2 Words and Phrases, 1897.   To deal in stock cattle and horses, there-

fore is to engage in the business of buying and selling such property with the object of gain, or, as said in the contract, "for speculative purposes."

Passing to the other point, it may be conceded that the expression "stock cattle" is not one carrying universal meaning in the sense that necessarily there is thereby presented the same thought in the same way to the minds of all men; but it is matters of uncertainty in the terms, stipulations and conditions of the contract, and not matters of mere definition, that come within the specific performance rule. And where, as here, parties contract with reference to cattle, and in doing so make use of the expression "stock cattle," and no mistake is alleged, it must be presumed to have been their mutual intent that the expression should be given the meaning common to the understanding of cattle men in general. And, in such view, it cannot be said that by using the expression the parties have involved themselves in any uncertainty as to the terms, etc., of their contract. The trouble is one of definition alone. And, as related to the situation in hand, upon definition depends no more than the identification of the subject-matter of the contract. It follows that there is involved simply an inquiry into the technical or special meaning of the expression as used among those who deal in cattle. And, if not to be found elsewhere, ample authority for such inquiry is afforded by the maxim that those things are certain which are capable of being made certain. "Parol evidence is always admissible . . . in order to connect the description with the thing intended, and thereby to identify the subject-matter, and to explain all technical terms and phrases used in a local or special sense." Pomeroy on Contracts (2d Ed.), 223.

Passing the question of enforceability of the contract, our consideration of the fact question of violation leads us to disagree with the conclusion reached by the trial court. The contract

3. CONTRACTS IN RESTRAINT OF TRADE: breach.

agreement, as we have seen, confined the right of defendant

to deal in stock cattle and horses "for his own use on his farm, but not for speculative purposes." And, if he could not violate this agreement by direct transactions, it stands to reason that he could not by circumlocution. The evidence shows repeated transactions in which defendant purchased horses and cattle — stock cattle, within the proof as to the meaning of that expression — and not by any fair intendment for use on his own farms. It is not necessary that we go into the transactions in detail. Some of them were conducted by defendant in his own name, and others in the name of his son-in-law, one Hogan, a member of a rival firm of dealers in cattle and horses. Defendant does not deny these transactions, but says that as to most of them — the others being trivial in character — he had no financial interest; that he was acting solely on behalf of Hogan. But it does not matter that he had no expectations of making money for himself. In the interest of plaintiff he had agreed to go out of the business and the effect of his disregard of that agreement by going about the country buying stock — sometimes giving his personal check in payment therefor, and sometimes the check of Hogan, as he says he was authorized to do — was equally potent as far as plaintiff was concerned whether he was doing this for pleasure as a favor merely to Hogan, or for the purposes of personal gain. This conclusion is not altogether out of harmony with what is said in *Grimm v. Warner*, 45 Iowa, 106, cited and relied upon by defendant. In that case the defendant counted upon a contract whereby there had been sold to him an ice business, and the good will thereof, with the agreement on the part of the seller that he would not again engage in the business in the same city. It was in evidence that afterwards the seller engaged as an employé of a rival concern in putting up ice and in conducting an ice business. The covenant embodied in the contract was construed to bind him no farther "than that he will do no act which will interfere with the purchaser retaining the customers that at the time of the contract patronized the seller.

He is bound to do no act which will divert the business which he transfers to the purchaser." And, in conclusion, it was held that the covenant was intended to bind the seller not to engage in the ice business, and this he did not do by working for those who were so engaged.

But, as the court is at present constituted, we think the decision in that case stopped short of the true rule. We may concede that, where one has contracted to remain out of a certain business, the prohibition is not to be taken as absolute in the sense that it extends of necessity to every branch of employment. Thus it might be held that assisting in the manual labor of putting up ice should not be construed into a contract violation. So, also, where one enters the service of a rival concern as bookkeeper, stockkeeper, watchman, to have charge of machinery, or other like employment. And this is so because it is not likely that out of these there could come any substantial mischief. The test, as we conceive, is mischief. And mischief begins when the scope and character of the employment is such as to result in all likelihood in substantial interference with the business which was the subject of the contract. And it will not do to say that there can be no interference if the seller shall refrain from any act which can operate to induce the customers of the old business to transfer their patronage to his new employer. Influence may be exerted indirectly as well as directly, and the purchaser of a business and its good will is entitled not only to protection in respect of customers then patrons, but to enter the field of competition unhampered by any adverse influence of the seller. Thus in *Finger v. Hahn,* 42 N. J. Eq. 607 (8 Atl. 654), it appeared that the defendant had sold out his butcher business, with an agreement that he would not carry on the business on his own account, or to operate any butcher business. The evidence showed that he was subsequently employed by a general store operating a butcher department, and that in the course of his employment he did the buying and selling, as well as cut the meats.

This was held to be a breach of his contract. In *Newling v. Dobell,* 19 Law T. (N. S.), 408, it appeared that the defendant in selling out had agreed not to carry on or be concerned or interested in the business of a tailor, and it was held that the contract was broken by working as journeyman for another; the court remarking that the covenant clearly embraced the exercise of his trade or skill for an employer, as well as for himself. And in reason this must be so. Take, for instance, the case of one who has established a reputation for great skill as a workman along a certain line, and who then sells out with an agreement on consideration that he will leave the field to his purchaser, to say that he would be at perfect liberty to step across the street and enter at once into the employ of a rival concern as manager would be shocking, as it would be intolerable. Of course, the world of business is such that the circumstances in each case must differ, and in conclusion we are disposed to agree with the Minnesota court *(Nelson v. Johnson,* 38 Minn. 255, 36 N. W. 868), by saying that " the court must consider the nature of the business which the party abandons, and agrees not to undertake, and the natural and reasonable effect of the said employment upon it, in determining whether the contract has been violated directly or indirectly; for, if there has been an indirect violation or fraudulent evasion of it, resulting in damage, it could hardly be material that he was receiving wages instead of profits."

Concluding, as we do, that the reasonable and probable results of the course of conduct shown on the part of defendant was to work interference with the business sold by him to plaintiff, and as no disposition to abstain therefrom in the future is manifested, there should have been a decree in favor of plaintiff, and the cause will be remanded that such may obtain.— *Reversed.*