C. H. BARRETT CO. *v.* AINSWORTH.

CONTRACTS—BREACH—INJUNCTION—COVENANT NOT TO ENGAGE IN COMPETING BUSINESS.

Defendant sold to complainant's assignor a grain elevator and storehouse, and, as a part of the consideration, agreed not to engage nor become interested in a competing business within a specified territory and for a specified time. . Subsequently he advanced money and indorsed notes for his son and another to enable them to engage in a competing business within the prohibited territory; gave their business the benefit of his experience and advice; and there was testimony tending to show that he actively engaged in buying grain for them. *Held*, that on such evidence, the court was justified in granting an injunction.

Appeal from Shiawassee; Wiest, J., presiding. Submitted January 18, 1909. (Docket No. 94.) Decided April 24, 1909.

Bill by the C. H. Barrett Company to enjoin Hiram N. Ainsworth from engaging in a competing business in violation of a written agreement. From a decree for complainant, defendant appeals. Affirmed.

*Kilpatrick & Pierpont*, for appellant.

*Chandler & Friegel*, for appellee.

MOORE, J. This is an appeal from a decree enjoining defendant from doing certain things. The following quotations from the decree will indicate some of the questions involved:

"The court finds that on May 10, 1906, the defendant, Hiram N. Ainsworth, and Clair H. Barrett, the assignor of complainant, entered into a contract, as follows:

"'This agreement made this 10th day of May, 1906, between Hiram N. Ainsworth of Owosso, Mich., of the first part, and Clair H. Barrett of Jackson, Mich., of the second part, witnesseth as follows: The said party of the first part, in consideration of the sum of ten thousand dollars to him to be paid by said party of second part as hereinafter stated, truly agrees to grant, bargain, sell, transfer and set over to said party of the second part and to his heirs, representatives and assigns, the frame grain, hay and bean elevator and storehouse with office and all structures used by first party in connection therewith on lots,   *   *   *   together with all the machinery, tools and all personal property connected therewith and now in use in and about the grain, hay, and bean business carried on at and on said premises by said first party.

"'And the said first party for the consideration aforesaid further agrees to assign, transfer and set over to said second party the lease from the Ann Arbor Railroad Company of and to the premises above described on which said elevator and elevator business now is situated.

"'That said party of the second part hereby agrees that he will pay said first party for said elevator and all of its belongings above agreed upon and intended to be conveyed by said first party to said second party and the assignment of said lease, the sum of ten thousand dollars on or before the first day of August, 1906.

" 'And the said first party hereby further agrees that upon the receipt of said money or moneys and stock hereinafter mentioned, shall and will assign said lease and make the necessary conveyance and transfer of said elevator and elevator property to said second party, his heirs or assigns.

" 'And it is further agreed that in case said party of the second part shall, on or before said first day of August next, form or cause to be formed a corporation under the laws of the State of Michigan for carrying on the business of buying and selling grain, feed, beans, seeds, hay and so forth, at said elevator and carrying on said elevator business on said premises, said party of the first part agrees to accept the sum of two thousand, five hundred of said ten thousand dollars in the stock of such corporation at par, provided the capital stock of such corporation shall not exceed $15,000.00.

" 'The said party of the first part for and in consideration of said sum of ten thousand dollars, agrees that in case of the payment of the same and the transfer of said property and the good will of said business as above agreed, he will not engage in said business or like business as now carried on by first party in said city of Owosso, nor within twenty miles of said city at any time within the next twenty years, nor become interested in any business of like nature without the written assent of second party.   *   *   *

" ' In witness whereof we have hereunto set our hands and seals, this 10th day of May, 1906.

" 'HIRAM N. AINSWORTH. [L.]
" 'CLAIR H. BARRETT. [L.]

" 'For a valuable consideration herein acknowledged, I hereby transfer and assign all my interest in the above agreement to the Barrett, Porter Co., its successors and assigns.

" 'CLAIR H. BARRETT.'

" And the court finds that the purchase price for said property was fully paid, and that at the time of the filing of the bill of complaint in this cause said agreement was a valid, subsisting agreement, and that such agreement and the benefits to be derived therefrom were duly transferred to and owned by the complainant in this cause, and the court further finds that before the filing of said bill of complaint the defendant had violated said agreement, in that the said Hiram N. Ainsworth had reengaged in like business and had become interested in a business of like nature in the city of Owosso against the legal and equitable rights of complainant as stated in said contract.

"It is therefore ordered, adjudged, and decreed that

the defendant, Hiram N. Ainsworth, be and is hereby permanently restrained from being in, or continuing or conducting any business, directly or indirectly, of buying, selling, and shipping grain, hay, straw, beans, feed, flour, and wool, or like business in the city of Owosso, nor within 20 miles thereof at any time within 20 years following May 10, 1906. It is further ordered, adjudged, and decreed that the question of damages for the breach of said contract is hereby reserved from this decree, and the complainant shall have the right to an action at law to recover such damages as complainant may have sustained by reason of such violation of said contract."

The important question in the case is whether defendant has violated his agreement. He claims that the competing business was that of Clapp & Ainsworth; the last name appearing in said firm name being that of his son. The defendant was a witness in the case. On the cross-examination he testified in part as follows:

"I am 52 years old. Have been working at the grain business for 30 years. Before I came to Owosso I was in Chesaning, which is about 15 miles from Owosso. After I came to Owosso I think some of the old customers on the dividing line came to Owosso to trade with me. I was in Chesaning two years. I then sold out and moved to Owosso. I was at Flushing before I went to Chesaning. Was there 15 years. Flushing is on the edge of Shiawassee county, and is about 18 to 20 miles from Owosso. I had a fair trade there, from the townships of New Haven and Hazelton in Shiawassee county, and after I moved to Owosso some of those customers on the dividing line came to Owosso to trade with me. I always got my share of the trade and tried to have a good prosperous business, and I think my good will in business was as good as the average dealer. I started in Owosso seven years ago. I was with Mr. Hamner in business something over 2 years. * * * Mr. Hamner and I had $20,000 capital invested in the business. We bought wool, hay, and stuff of that kind. We bought flour in the retail way. When Mr. Hamner went out I bought out what there was. * * *

"Q. After you started in there, how much capital did you have?

"A. I had something over $10,000.00, and increased

that from time to time until I sold out to Barrett, Porter Company, when I was using in the business from $5,000 to $25,000 according to the season of the year. This was in addition to the buildings and equipment. This was used in buying and selling coal, wood, hay, grain, wheat, beans, and stuff that was handled generally in an elevator, not much barley, some rye, but not much, some flour. After we had run a few years, we put in a small feed grinder and ground our own feed and sold it. All kinds of bran were handled, and generally sold seed of all kinds to the farmers. We bought all kinds of things a farmer had to sell, except potatoes, vegetables, etc. We bought everything in the grain line, and wool, corn, and coal and wood. That was the line of business we were in at the time we sold to Barrett, Porter Company. * * * I finally made up my mind to sell out and quit the business entirely. That was my intention when I sold to Barrett, Porter Company, to turn everything over to them, including the good will of the business, and I reserved no part of the business in any way. He had the business, and he has got it yet for anything that I know of. That business has been continued by the Barrett, Porter Company and the C. H. Barrett Company so far as I know. * * *

"Q. When was it you were reminded to help your son go into business? I see those deeds are dated the 26th of September?

"A. Well, it was along the 10th or 15th of September, some time in the month of September, I would not say the dates. My son was in Chicago, and he wanted to go into business, and come home in the summer of 1907.

"Q. What were the steps you took to assist your son first? What did you do?

"A. Why, he and Clapp wanted to buy that mill property, and I proposed to let him have $1,500 to start it, and I would indorse their paper for what they wanted to use. By the mill property I mean the mill, elevator, and cooper shop—what was there. There had been a mill and elevator there ever since I had been in town and before.

"Q. Then at that time, in order to help your son and Clapp in that business, as you claim, you put in somewhere about $7,500, did you not?

"A. No, sir.

"Q. You claim you gave $1,500 of it to your son?

"A. He put that in, that $1,500 I gave him.

"Q. But it came from you as you understood it?

"*A.* Yes, sir.

"*Q.* Your son had no money?

"*A.* He had no money. I gave this $1,500 right out.

"*Q.* You understood what he was to do with it at the time you turned it over to him?

"*A.* Yes, sir.

"*Q.* Yes. You gave that, and then you put in this other money for the purpose of starting this business?

"*A.* Didn't put in any other money.

"*Q.* You put in your credit, didn't you?

"*A.* I indorsed a note with these parties.

"*Q.* Did you or did you not put in your credit for the purpose of starting this business?

"*A.* You may call it credit or what you wish; I indorsed a paper.

"*Q.* Was it for the purpose of starting this business?

"*A.* Yes, sir; it was to be used in that business.

"*Q.* That was planned out between you and your son and Clapp, that you should do it that way, was it?

"*A.* That was the way it was agreed. .

"*Q.* You understood at that time, did you not, that without you did put that amount into it and be the bottom and backing of it that that business would not start in that name of Clapp & Ainsworth, didn't you?

"*A.* I don't think it could.   *   *   *

"*Q.* From the time you put that money in there until the present time, you have been practically the sole backing and financial part of that concern, have you not?

"*A.* I have backed them for what money they wanted to use. I think I have.   *   *   *

"*Q.* It was your credit, and the $1,500 that you furnished and the thousand that Clapp furnished, that has carried on that business and run that business from the time the deed was made to the present time?

"*A.* That is what has run it; yes, sir.   *   *   *

"*Q.* Have you told now all that you did to help your son, Harry, besides furnishing him the capital to run the business?

"*A.* That is the only thing that I think of.

"*Q.* Did you give him your counsel, the benefit of your experience in the business?

"*A.* If he asked me for it, I did.

"*Q.* Did you?

"*A.* Occasionally he has asked me about things. I have told him what I thought of it.

"*Q.* How long a time has that conduct on your part continued, giving him the benefit of your experience, and counsel in the business?

"*A.* Since he has been in the business.

"*Q.* What?·

"*A.* Since he started.

"*Q.* Ever since he started in business?

"*A.* Yes, sir.

"*Q.* Have you explained to him about buying, how to buy stuff?

"*A.* I have; yes, sir. I told him how to buy. I have not kept him posted on prices. He understands that himself. He had some experience with me, but not a great deal, before I sold out.

"*Q.* He had neither money nor experience when he went into the business there?

"*A.* The only experience he had was with me in the business.

"*Q.* You supplied him with both, as far as you thought he needed it, did you?

"*A.* Yes. I could have supplied him with more.

"*Q.* How much money did you put into the common fund there in the manner which you explained to Mr. Kilpatrick?

"*A.* I didn't put any into the common fund.

"*Q.* Well, in your account in the business?

"*A.* Sometimes I would have a hundred, sometimes I would have a thousand, sometimes more, sometimes less.

"*Q.* About how much of the time did you have a thousand to your account there?

"*A.* I couldn't say.

"*Q.* When you had a thousand to your account there, do you know whether or not that was used in the business of buying and selling, the same as the other?

"*A.* I expect it was. I don't know what they did with their money when I put it in.

"*Q.* Was that your understanding that was the way it was done?

"*A.* Yes. * * *

"*Q.* Witness, you said something about advising Clapp & Ainsworth in regard to the board of trade deal. Did they follow your advice?

"*A.* They did.

"*Q.* In such matters when you told them?

"*A.* Sometimes.

"*Q.* Did they usually ?

"*A.* They did in that case.

"*Q.* Well, didn't they, considering the fact of your experience with markets and with quality of goods and seasons and the country trade, do you not think they generally accepted your judgment ?

"*A.* I think they did.   *   *   *

"*Q.* That was the horse you claim was the delivery horse ?

"*A.* Yes, sir.   At the time the business started up they commenced hiring a delivery horse down there.   I said to them one day: 'I have a horse up there in the barn, if you can use him in the business, you can do so, if you want to furnish oats and bedding for him.'   They said, 'All right,' they would be glad to do so.   *   *   *

"*Q.* Was there some misunderstanding at the time Mr. Clapp quit, between you and he ?

"*A.* There was no misunderstanding.   I did not think he did right in taking the books and money, and he told me it was nothing to me, as I was not interested there; but I told him as long as I was indorser on their paper I had some interest in the way things were run.   After Clapp drew his thousand dollars out, no one had anything in there except my son, and the money borrowed at the bank.   *   *   *

"*Q.* After Clapp drew out his $800 to $1,000 that was there, there was nobody had any interest in it but you, except the money which you said that you let your son have, isn't that right ?

"*A.* Why, they had money they were using that they got from the bank.

"*Q.* Well, any other money than what has been spoken of, upon your indorsement ?

"*A.* Not that I know of.

"*Q.* When Clapp drew his $1,000 out, who had any money in there except what you had enabled them to get on your indorsement or put in there, as you have stated ?

"*A.* Nobody that I know of."

There was a good deal of testimony that defendant had been on the street buying grain for the competing business. This testimony, which it is not necessary to recite in detail, taken in connection with the cross-examination of defendant, shows very clearly that the conclusion of the circuit judge that defendant had violated his agree-

ment is justified. He should be enjoined under the following authorities: *Timmerman* v. *Dever*, 52 Mich. 34; *Reber* v. *Pearson*, 155 Mich. 593, and the authorities cited therein.

The other questions argued by counsel have been considered, but we do not deem it necessary to discuss them.

The decree is affirmed, with costs.

Blair, C. J., and Grant, Montgomery, and Hooker, JJ., concurred.