L. H. HENRY & SONS, Appellees, v. D. B. RHINESMITH et al., Appellants.

No. 42750.

APRIL 2, 1935.

Campbell & Campbell and W. G. Henke, for appellants.

E. C. Hardwig and R. W. Zastrow, for appellees.

POWERS, J.—Plaintiff-appellee, L. H. Henry & Sons, is the publisher of a daily newspaper at Charles City, Iowa, known as the Daily Press. The defendants-appellants, D. B. Rhinesmith, M. J. Rhinesmith, and the Intelligencer Printing Company, were, prior to the 9th day of February, 1929, the publishers of a semi-weekly newspaper at Charles City, Iowa, known as the Twice-a-Week News.

On the 9th day of February, 1929, these parties entered into a contract by which the above-named defendants-appellants, in consideration of the payment to them of the sum of $5,000, transferred the subscription list and the good will and the past-due accounts of the Twice-a-Week News to plaintiff-appellee, and under said contract said appellants agreed that during the period of fifteen years from and after the date of the contract they would not, either directly or indirectly, either individually or together, or for others, engage in the publication of any newspaper in Charles City, Iowa. And, further, that they would not lease, sell, or dispose of their printing plant, or any part of the same, to anyone who would become indentified with the newspaper business in Charles City, Iowa, during said period. Said appellants continued a job printing business following the transfer of the newspaper business to appellee. Subsequently, they became associated with their codefendant and appellant, Grant M. Coover, in the publication of what was called the Shopping Guide, which was what is popularly known as a free newspaper and did not have a subscription list. To restrain the publication and circulation of the Shopping Guide by said appellants, this action was brought.

I. It is claimed by appellants that the contract is invalid as being in restraint of trade. Contracts not to engage in a par-

ticular business or profession at a certain place for a limited period are quite generally held valid by this and other courts when made in connection with the sale of a business or professional practice and for the purpose of protecting the purchaser in the enjoyment of the thing purchased. The agreement here not to engage either alone or with others in the publication or circulation of a newspaper in Charles City for a period of fifteen years was reasonably necessary to enable the purchaser to obtain the benefits of his purchase under the contract. It was not unreasonable or oppressive or inequitable and was not only a valid contract, but such a contract as a court of equity would enforce and prevent its violation by injunction. Andrews v. Kingsbury, 212 Ill. 97, 72 N. E. 11; Heinz v. Roberts, 135 Iowa 748, 110 N. W. 1034; Haggin v. Derby, 209 Iowa 939, 229 N. W. 257; Vandiver v. Robertson & Son, 125 Mo. App. 307, 102 S. W. 659; Rowe v. Toon, 185 Iowa 848, 169 N. W. 38; Sickles v. Lauman, 185 Iowa 37, 169 N. W. 670, 4 A. L. R. 1073; Proctor v. Hansel, 205 Iowa 542, 218 N. W. 255, 58 A. L. R. 153. See, also, Pomeroy's Eq. Jurisprudence, vol. 4, section 1715; 41 C. J. 175.

II. The second question that arises is whether the Shopping Guide is a newspaper within the meaning of this contract. The evidence in the case showed that newspapers operating in Charles City and similar communities obtained about 75 per cent of their revenue from advertising and about 25 per cent from subscriptions, and that one of the inducements for the purchase by the appellants of the Twice-a-Week News was the fact that the advertising field was so limited that both papers could not profitably operate. It further appeared that most of the advertisers had an advertising budget, a fixed amount to be spent for newspaper advertising in Charles City, and that, where two newspapers were used, the aggregate would not be in excess of what would be spent for advertising in one newspaper if only one were used. It further appeared that advertising rates depended upon the amount of circulation.

The publication gotten out as the Shopping Guide contained items of current news. It contained serial stories, some editorial comment, items taken from newspapers, and a large amount of advertising. It was, in form, a newspaper hardly distinguishable in its general appearance from the ordinary county seat newspaper in Iowa. It contained the statement that it had a guaranteed circula-

tion of 4,250 copies, and underneath the name the designation, "a weekly magazine".

The appellants say that the Shopping Guide is an advertising sheet. It contains eight pages. The difference between an advertising sheet of eight pages and a newspaper of the same size is not easy of definition. Very frequently, no doubt, the terms with propriety might be used interchangeably. Webster defines a newspaper as "a paper printed and distributed at intervals, usually daily or weekly to convey news, advocate opinions, etc. now usually containing also advertisements and other matters of public interest." Under this definition, the Shopping Guide would appear to be a newspaper. There are other definitions which include as newspapers only those publications for which a charge is made.. Of course, what may be a newspaper for one purpose may not be for another. We are concerned here only with the meaning of the term as used in the contract between the parties. What the term means in the contract under consideration here must be arrived at by ascertaining what the parties intended it to mean in view of the circumstances under which the contract was made and the provisions of the contract itself and its obvious purpose. Since newspapers of this character normally obtain 75 per cent of their revenue from advertising and only 25 per cent from subscriptions, it is apparent that if the publisher cuts down the cost of production 25 per cent by reducing the news content of the paper, he could produce a free paper as profitably as one that had regular subscribers. Indeed, it appears that the Twice-a-Week publication which the appellants sold to appellee had a relatively small subscription list (the subscription list of the Daily Press was increased 271 by its acquisition) whereas, the Shopping Guide guaranteed a circulation of 4,250, and since the advertising rate depends upon the circulation, it is probable that the total revenues from the publication of the free newspaper might exceed those obtained from the publication of one with a paid circulation list.

If a publisher of a newspaper should decide to increase its circulation by not charging anything for subscriptions, and by reason of such increased circulation increase his advertising rates, and could thereby as successfully operate as by charging a subscription, it is difficult to see why the publication should lose its character as a newspaper. Certainly, so far as the advertisers are concerned, it would still be considered as a newspaper for advertising purposes.

1092

But however that may be, it is apparent in this record that the publication of the Shopping Guide appealed to readers of local newspapers the same as any similar publication having a paid subscription list and that it appealed to advertisers seeking local newspaper advertising, and that it was designed to, and did, in fact, intrench upon the very business which was sold by the Rhinesmiths and the Intelligencer Printing Company to appellee, and for the protection of which they had agreed not to engage in the publication of a newspaper in the city of Charles City for a period of fiifteen years. Within the meaning of the term, "newspaper", as used in the contract between these parties, such publication was a newspaper and its publication in Charles City by the Rhinesmiths or the Intelligencer Printing Company was a violation of the contract between the parties.

III. Complaint is also made that the decree enjoined not only those appellants who were parties to the contract, but also Grant M. Coover, who was not a party to the contract.

The decree restrained the appellant Coover only from publishing the Shopping Guide at Charles City, Iowa, in conjunction with the other appellants who were parties to the contract, and from inducing such other appellants to publish the Shopping Guide, or a similar newspaper, at Charles City, Iowa. The decree did not attempt to enjoin Coover from publishing a newspaper on his own account, but only in conjunction with those appellants who were parties to the contract, and from inducing them to violate the contract. This was proper. It is well settled that an injunction will lie to prevent third parties from inducing parties to a contract to violate it. 32 C. J., 228, and cases cited. The decree in this case does no more than that.

IV. It is also urged that the decree in the case is too indefinite and uncertain.

The decree restrains the Rhinesmiths and the Intelligencer Printing Company from, directly or indirectly, publishing the Shopping Guide, or any similar paper in Charles City, and from circulating or soliciting advertising for the Shopping Guide, or any like or similar paper in Charles City. This much of the decree we believe to be proper.

The decree, however, further enjoins said appellants from doing any act which "would infringe upon the rights of the plaintiffs under said contract" or "in any way infringing upon the good will

of the Twice-a-Week News transferred by said defendants to the plaintiff." An injunction was ordered issued accordingly.

Where one may subject himself to the perils of contempt of court for violation of an injunction, he is entitled to know specifically what the things are that he is restrained from doing, and we are inclined to the belief that an injunction which, in general terms, restrains the violation of a contract and subjects the defendant to proceedings for contempt if he should make a mistake as to what the things are which constitute a violation of the contract, is improper. It has been held improper to restrain the violation of a certain statute on the ground that such injunction was too indefinite and uncertain. Lone Star Salt Co. v. Blount, 49 Tex. Civ. App. 138, 107 S. W. 1163. Similarly, it has been held that an injunction to abate a nuisance should specifically point out the particular things which the defendant is to do or refrain from doing; that "to adjudge that defendant should so conduct his business as not to be offensive is to give him no rule of conduct which the law had not before prescribed." Ballentine v. Webb, 84 Mich. 38, 47 N. W. 485, 13 L. R. A. 321. For these same reasons, the injunction in the instant case, so far as it restrains, generally, the violation of a certain contract, and the doing of any act which would infringe on the right of the plaintiff under said contract, gives the defendant no standard of conduct which the contract had not previously prescribed. Moreover, the petition in the case did not allege any violation of the contract except the publication, or threatened publication, of the Shopping Guide, or similar newspaper, and there was no occasion for the court to go beyond the issues joined by the parties with reference thereto. We are of the opinion that the decree below should be and is hereby modified by the elimination of these general provisions, and in all other respects it should be and is hereby affirmed.

The motion of appellee to dismiss the appeal because of appellants' alleged default in filing argument, submitted with the case, is overruled.—Modified and affirmed.

All Justices concur.