UPTOWN FOOD STORE, INC., an Iowa corporation, appellant, v. T. A. GINSBERG et ux., appellees.

No. 50969.

(Reported in 123 N.W.2d 59)

July 16, 1963.

McManus & McManus, of Keokuk, for appellant.

George L. Norman, of Keokuk, for appellees.

THORNTON, J.—Plaintiff's suit is to enforce a negative cove-

nant contained in a lease. Plaintiff-corporation leased realty, equipment and fixtures from defendants for the purpose of merchandising "groceries, meats, produce and allied lines of merchandise customarily sold in supermarkets and no other." The lease provides the rental shall be paid on a percentage basis with a minimum and maximum. The term was for five years commencing September 28, 1954. The lease provided for renewal periods and plaintiff is in possession at all times pertinent under an agreed renewal. The lease contained the following paragraph:

"13. Lessors expressly grant to the Lessee all rights and privileges in and to the trade name 'Uptown Food Stores' under which trade name the Lessors have heretofore conducted a food store business in the City of Keokuk, Lee County, Iowa. The Lessors further expressly agree not to engage in the business of food retailing, either directly or indirectly, in the City of Keokuk, Lee County, Iowa, other than at the store presently operated by them and located at 810 Main Street, Keokuk, Lee County, Iowa, or in any way to compete with the business of the Lessee in the City of Keokuk, Lee County, Iowa, during the term of this lease or any extension or renewal thereof except as hereinabove provided for."

The lease was signed, "T. A. Ginsberg, Helen K. Ginsberg, Lessors."

Plaintiff contends defendant T. A. Ginsberg has violated the negative covenant in paragraph 13 by financing, assisting in financing and assisting his 26-year-old son, Ronald Ginsberg, in the operation and management of a supermarket known as the Big G Discount Store in Keokuk.

The trial court held the covenant of defendants-lessors was joint and not several and was not violated by the acts of T. A. Ginsberg alone. It also held the actions of T. A. Ginsberg did not violate the terms of the covenant.

Plaintiff urges for reversal here the covenant was several as well as joint, i.e., one of the covenantors acting alone could violate the covenant, and the acts of T. A. Ginsberg violated the covenant. Another proposition to sustain the trial court is raised by appellee. The trial court did not mention it but defendant

so pleaded in his answer. It is, that the provision itself is invalid because of the provision permitting defendants to operate their store at 810 Main Street and enforcement would not be to protect plaintiff but is an invalid and unenforceable penalty against defendant. The action was dismissed by the court as to defendant Helen Ginsberg before trial. This is not argued here.

It is apparent, if the trial court was correct on either proposition passed on, or defendant is correct on the matter urged to sustain the decree, the decree of the trial court must be affirmed. On the other hand it is necessary for plaintiff to prevail as to all to obtain a reversal.

I. Our review in this equity action is de novo. Rule 334, Rules of Civil Procedure. The scope of review is the entire action. Cuthbertson v. Harry C. Harter Post No. 839 of V. F. W., 245 Iowa 922, 927, 65 N.W.2d 83, 87. Defendant may properly sustain the decree by pleaded propositions not reflected in the trial court's findings and conclusions, Brandt v. Schucha, 250 Iowa 679, 682, 96 N.W.2d 179, 181, and matters not argued here are waived, rule 344(a)(4)(Third), Rules of Civil Procedure.

II. The trial court's conclusion of law that defendants are bound jointly and not severally, i.e., that one of the signers cannot alone violate the covenant, but to violate the covenant they must act jointly, finds support in Streichen v. Fehleisen, 112 Iowa 612, 84 N.W. 715, 51 L. R. A. 412; Rapalee v. Malmquist & Son, 165 Iowa 249, 145 N.W. 279; and Barron v. Collenbaugh, 114 Iowa 71, 86 N.W. 53. See also Williams v. Mercury Record Corporation, 295 F.2d 284 (7th Cir. 1961).

In Streichen defendant and his brother ran a lumberyard under the name of Boone Lumber Company. They sold the "real estate, office, sheds, and scales of the Boone Lumber Company." The covenant of the two partners was, "* * * the undersigned hereby agree that they will not start a new or fourth lumberyard in the city of Boone, * * *." Each signed individually. It was claimed there as here the manner of signing indicated an individual agreement. We held the contract was joint, stating at page 615 of 112 Iowa, page 716 of 84 N.W.: "* * * for he had never agreed not to engage in the business as an individual.

His contract, as a member of the partnership, was that the firm would not enter said business within the time specified. The contract might have been so drawn as to cover the individual acts of each partner, and it may have been the intention of the plaintiffs to reach such a result, but it does not do so; and the law, not favoring contracts in restraint of trade, will construe it strictly. Greenhood Public Policy, 735; Haldeman v. Simonton, 55 Iowa 144 [7 N.W. 493]."

We further pointed out in Streichen that section 3465, Code of Iowa, 1897, now section 613.1, Code of Iowa, 1962, which provides, "Where two or more persons are bound by contract * * * whether jointly only, or jointly and severally, or severally only, * * * the action * * * may * * * be brought against any or all of them" had no application because there was not a violation of the contract.

In Rapalee the action was against the partnership and its members individually. The covenant under consideration was, "said John Malmquist & Son will not directly or indirectly engage in the marble and granite business." The firm name was signed "John Malmquist & Son." We again held an act of an individual partner did not violate the covenant. We said at page 251 of 165 Iowa, page 280 of 145 N.W.:

"The fact that this contract provides that said John Malmquist & Son will not directly or indirectly engage in such business does not change the rule, because it is the firm which is not to engage in the business directly or indirectly."

It was again pointed out the contract might have been drawn to cover the acts of the individual partners.

In the Barron case, supra, an action for damages for breach of a contract not to engage in the livery business, the contract provided, "agrees * * * that he [first party] will not re-engage in the livery business * * * during the time said parties of the second part may be engaged in said livery business on the above-named premises." One of the second parties assigned his interest in the contract to the other, the plaintiff. We there held because of the wording of the contract the defendant covenantor could re-engage in the livery business after second parties ceased to do business as a partnership.

In each of the above cases we cited Haldeman v. Simonton, 55 Iowa 144, 7 N.W. 493, as authority for the statement that the contract being in restraint of trade is to be strictly construed. What is actually said in Haldeman is, at page 146 of 55 Iowa, page 494 of 7 N.W.: "The contract [sale of medical practice], being in restraint of trade and personal liberty, should not be construed to extend beyond its fair import."

In the Williams case, supra, plaintiff sought a declaratory judgment. He, together with four others, had entered into a contract to make phonograph records for defendant. Defendant contended for plaintiff alone to make records for another company violated his contract. The contract provided, "* * * the Artist agrees * * * he will not perform any material for any person other than [defendant]." The Court of Appeals at page 286 of 295 F.2d said:

"The artist parties to the contract are listed at the outset not only by their individual names but also by the group name. The wording of the minimum recording requirements, the provisions for payment of royalties, repeated references throughout the body of the contract to the group name, and the use of the group name in the signature, all support the construction that Mercury was dealing with these singers only as a group singing together, and not as so many individuals singing solo performances."

No mention is made by the Court of Appeals of construing the contract strictly.

In Sickles v. Lauman, 185 Iowa 37, 45, 169 N.W. 670, 673, 4 A. L. R. 1073, a case dealing with the assignment of the covenantee's interest in a covenant not to compete, we said:

"In discussion, courts sometimes indulge in the loose generality that the law does not favor contracts in restraint of trade, and therefore an agreement by which a party undertakes not to enter a specific business in a specified city or town will be strictly construed. What the law does disfavor are contracts which unreasonably restrict the individual in his liberty of occupation and employment. But there is no public policy or rule of law which condemns or holds in disfavor a fair and reasonable agreement of this character, and such a contract is entitled to

the same reasonable construction and the same effective enforcement that are accorded to business obligations in general."

The above from the Sickles case places the construction of the contract in this case in proper perspective. It is not contended the contract is unreasonable as to size of the restricted area, the time element, service performed by covenantor, or the general circumstances involved. See Federated Mutual Implement and Hardware Ins. Co. v. Erickson, 252 Iowa 1208, 1212, 110 N.W.2d 264, 266; Cogley Clinic v. Martini, 253 Iowa 541, 112 N.W.2d 678; Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405; and Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377. Nor would the contract be unreasonable in any respect if it does restrict T. A. Ginsberg personally.

The question to be determined is whether the covenant not to engage in the business or in any way to compete is breached by acts of one of the covenantors. This is to be determined by the ordinary rule of construction, the intent of the parties from the wording of the contract itself with regard to the circumstances, and purpose to be accomplished. Haggin v. Derby, 209 Iowa 939, 945, 229 N.W. 257, 260.

T. A. Ginsberg testified his wife and he owned the property. It is not clear that he referred only to the real estate. However, in the lease they did lease the fixtures and equipment. From this we may properly find both were owners of the realty and fixtures. In paragraph 13 they, as lessors, sold the trade name, "Uptown Food Stores", to plaintiff, and it is there recited, "under which trade name the Lessors have heretofore conducted a food store business." The record contains no other evidence or explanation. We must find both were interested in the grocery business, that they were partners. But we do not believe it follows that as partners only might they breach the covenant. The grocery business partnership was necessarily dissolved at that location on signing the lease. The result to be accomplished was to lessen competition in Keokuk during the term of the lease or a renewal. In addition to agreeing "not to engage in the business * * * either directly or indirectly," they agreed not to "in any way compete with the business of the Lessee." This includes all or every manner or mode of competing. The word "any" has

the force and effect of "all" or "every." Barber v. State Farm Mutual Automobile Ins. Co., 254 Iowa 1280, 1282, 121 N.W.2d 147, 148, 149, and citations. "Way" is defined in Webster's Third New International Dictionary as the mode in which something is done. Synonyms are, manner, method and style. ·This refers not only to opening another supermarket but to such other competing as human ingenuity might devise. We think fairly interpreted it includes one of two joint covenantors competing. To construe the language of this covenant as being limited to joint action by the lessors reaches an absurd result. Each could open independent businesses, one on each side of plaintiff's location. In fairness to both parties such intention should not be attributed to them.

In addition to the above, the parties bound their "heirs, executors, administrators, assigns and successors." This is consistent with an intention to be both jointly and severally bound. Yadusky v. Shugars, 301 Pa. 99, 151 A. 785; and 17A C. J. S., Contracts, page 350, section 355a.(1).

In Southworth v. Davison, 106 Minn. 119, 122, 118 N.W. 363, 364, 19 L. R. A., N. S., 769, 16 Ann. Cas. 253, in passing on a similar claim the Minnesota court said:

"It [sale of good will] stands, so far as bargain and sale is concerned, as other partnership property; and, as an ordinary sale of an article owned by the firm binds all the members thereof, the sale of the good will has the same effect. * * * And to construe the contract in harmony with defendants' contention would expressly destroy the purpose intended by the transaction, viz., the prevention of defendants, either as partners or individuals, from competing in the laundry business in Northfield. And, though contracts of this kind are generally strictly construed, the rule is not so severe as to justify a conclusion at variance with the plain purpose and intention of the parties."

In 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, page 548, section 70, is this statement:

"Where the contract or covenant is executed by joint owners and signed by them in their individual names, and it is stipulated that 'we agree and bind ourselves not to enter into or conduct' a similar business, the covenanters are bound individ-

ually. Where a partnership sells its business and covenants not to compete with the purchaser therein, the partners are, of course, bound both as individuals and as a copartnership entity. A member of the firm, by re-engaging in business, violates the covenant so as to render himself liable for the breach."

The above statement is fully supported by the following authorities cited in the footnotes. .

Raymond v. Yarrington, 96 Tex. 443, 73 S.W. 800, 62 L. R. A. 962, 97 Am. St. Rep. 914, 916, 917, holds it was a breach of contract for either partner to engage in business contrary to the covenant.

In Trenton Potteries Co. v. Oliphant, 58 N. J. Eq. 507, 512, 513, 43 A. 723, 725, 46 L. R. A. 255, 78 Am. St. Rep. 612, 616, in discussing the following, "* * * we will not directly or indirectly engage in a competitive business", the court said:

"These words, over individual signatures respecting a business previously averred to be a partnership business, indicate several as well as joint undertakings. It is as if they undertook that they would not directly, by their joint act as a firm, or indirectly, by any several act of any member, engage in a competitive business."

Love v. Stidham, 18 App. D. C. 306, 53 L. R. A. 397, 400, 401. The court there said:

"There can be no question but that the covenant sued on is, by its terms, a joint covenant, and not joint and several. But does it follow that it requires the joint act of both defendants in order to constitute a breach of this covenant? A joint covenant does not necessarily mean a joint act to incur liability under it. The covenant is negative in form, that is to say, that the party of the first part 'shall not enter into the retail grocery business for the period of five years, within 1 mile,' etc. The covenant is not 'that the party' shall not as partners, and only as partners, enter into the retail grocery business, but they jointly obligated themselves that they will not enter into such business. They ceased to be partners from the time of selling out their business to the plaintiffs. To say that there could be no violation of the covenant except by the joint acts of the defendants as and in their character of partners would seem at once to

deprive the plaintiffs of all substantial benefit and protection of the covenant, by reason of the easy manner in which it could be evaded. * * * The substance of the covenant ought not to be sacrificed to a dry technicality without reason, as would certainly be the case if one, or both of the defendants separately could do what the defendant Stidham has done without incurring liability under the covenant."

See also Hubbard v. Miller, 27 Mich. 15, 15 Am. Rep. 153, 161.

In Palmer v. Prunty, 168 Ohio St. 573, 156 N.E.2d 831, 832, the Supreme Court of Ohio in a per curiam opinion held the husband of the owner of the business sold who devoted full time to its operation, was instrumental in the sale and joined in signing as seller was bound by the covenant not to compete.

The only authorities to apply the rule of strict construction to contracts in restraint of trade to determine whether one partner may breach such contract are our cases Streichen v. Fehleisen, 112 Iowa 612, 84 N.W. 715, 51 L. R. A. 412; and Rapalee v. Malmquist & Son, 165 Iowa 249, 145 N.W. 279, which are hereby overruled. We now hold this application of the rule of strict construction is error and that such is limited as stated in Sickles v. Lauman, supra, 185 Iowa 37, 45, 169 N.W. 670, 4 A. L. R. 1073. The acts of one partner may constitute a breach of the covenant not to engage in business or not to compete.

III. The next proposition is whether the financing and other assistance given the son, Ronald Ginsberg, by his father, defendant T. A. Ginsberg, constitute a violation of the covenant.

Mr. Ginsberg testified that his son, Ronald, is 26 years old. He has lived and does live at home. The family, Mr. and Mrs. Ginsberg and Ronald, moved to Arizona in 1956. While there Ronald managed a shoe store. Defendant returned to Keokuk in August of 1961. Ronald had $7000 and wanted to open the Big G. Defendant and his wife loaned Ronald $20,000 in December 1961 to start the store. They cosigned a $10,000 note at the bank. Defendant signed as surety on a store fixtures contract for $36,000. He signed a guaranty on the sales tax permit. He signed as surety on supply contracts, some with Swift and Wilson. He discussed prices with the beer distributor and the

Quincy Maid Potato Chips. He discussed kickback on ice cream while Ronald was present. He discussed purchases with National Biscuit. He had conversations with representatives of Swift Ice Cream and Vita Pak Crackers to find out what kind of deals they were offering the trade. In short he talked with all the suppliers. And he testified, "All of these conversations with suppliers occurred since August of 1961 and I still continue to talk with them." The trial took place April 27, 1962. He also testified:

"When my son has asked me, I have given him advice and suggestions concerning the operation of Big G. I discuss this operation with him most every day. I am frequently present, almost daily, in the building where Big G is located. I spend several hours there as a rule."

He took part in the negotiations for the lease and the remodeling of the building. He checks the advertising and has suggested improvements. He has occasionally made retail sales to customers. He operates a wholesale business selling fruits and vegetables, but so far has only sold to Big G. He has sold it $18,000 to $20,000 worth and does not know how much of this has been paid.

He knew the gross volume of Big G projected on an annual basis would be around a half million dollars, the gross sales so far in the year were around $10,000 per week for all departments.

He testified he had no interest in the Big G and received no income from it.

Mr. Ginsberg had been in the retail grocery business 25 years. Ronald's only prior experience in the grocery business had been working for his father.

From the foregoing we think it is clear that Mr. T. A. Ginsberg has taken a large part in the management of the Big G. He admits to doing everything except hiring the employees and taking the money to the bank. No inquiries were propounded bearing on the latter. From all of the testimony a proper finding based on circumstantial evidence could be made that T. A. Ginsberg has an interest in Big G. His actions make such finding reasonably probable, not merely possible, and more probable than any other finding based on such evidence. However it is

not necessary to go that far. In Wilson v. Delaney, 137 Iowa 636. 640, 113 N.W. 842, we held dealings of a livestock dealer were "equally potent as far as plaintiff was concerned whether he was doing this for pleasure as a favor merely to Hogan, or for the purposes of personal gain." In Wilson defendant sold his interest in a business of buying and selling livestock and horses. He agreed "not to deal in stock, cattle or horses except for his own use on his farms, but not for speculative purpose in the stock vicinity of Marengo." Defendant made repeated transactions in horses and cattle not for use on his farms. He did not deny them but said he had no financial interest, that he was acting for his son-in-law, a member of a firm of livestock dealers. In the course of the opinion we said at page 641 of 137 Iowa, page 844 of 113 N.W.:

"The test, as we conceive, is mischief. And mischief begins when the scope and character of the employment is such as to result in all likelihood in substantial interference with the business which was the subject of the contract. And it will not do to say that there can be no interference if the seller shall refrain from any act which can operate to induce the customers of the old business to transfer their patronage to his new employer. Influence may be exerted indirectly as well as directly, and the purchaser of a business and its good will is entitled not only to protection in respect of customers then patrons, but to enter the field of competition unhampered by any adverse influence of the seller."

The opinion at page 642 of 137 Iowa, page 844 of 113 N.W., concludes, "Concluding, as we do, that the reasonable and probable results of the course of conduct shown on the part of defendant was to work interference with the business sold by him to plaintiff, * * * there should have been a decree in favor of plaintiff * * *."

In addition to furnishing the financing for Big G, defendant T. A. Ginsberg has performed substantially all of the services of a manager or owner on a daily basis. This is at least indirectly engaging in the business and comes within his agreement, "not to * * * in any way * * * compete with the business of the Lessee * * *."

"Compete" is defined in Webster's New International Dic-

tionary, Second Edition, in pertinent part, as follows: "1. * * *
to contend * * * in business; as, tradesmen compete with one
another."

The reasonable and probable result of defendant's actions is
to take business away from plaintiff. By his efforts he has in-
creased plaintiff's competition, this is what he agreed not to do.

On the face of the opinion in Adams v. Adams, 156 Neb.
778, 58 N.W.2d 172, it is contrary to our holding here. We have
examined it closely but are not persuaded it is in point here or
should be followed by us. Apparently the case turns on the
agreement that appellee would not set up or establish a business
competitive with appellant and the court found appellee only
furnished gratuitous assistance.

Defendant here also cites Gallup Electric Light Co. v.
Pacific Improvement Co., 16 N. M. 86, 113 P. 848; and General
Bronze Corp. v. Schmeling, 213 Wis. 150, 250 N.W. 412, 93
A. L. R. 114. The Gallup case only holds financing does not
violate the covenant not to compete. The General Bronze case
is one for contempt. In the covenant involved the defendants
agreed not to engage directly or indirectly in business in com-
petition with plaintiff, except that defendants could become
employees of a competitor. The decision turned on whether
defendants were good faith employees.

Our view that defendant has violated the covenant finds
support in C. H. Barrett Co. v. Ainsworth, 156 Mich. 351, 120
N.W. 797, where a father assisted his son in much the same way
in the grain business, and in Amsterdam v. Marmor, 125 Misc.
865, 866, 212 N. Y. S. 300, 301, where the court stated:

"We think that defendant violated the covenant not to 'in
any manner whatsoever become interested, directly or indirectly,
in any business,' etc., by assisting his brother-in-law to establish
a business next door, by extending to him a credit for merchan-
dise, and guaranteeing accounts for him, thus securing credit
which had been denied, and actually advising the choice of mer-
chandise and going with him and picking out merchandise. Such
a covenant must be construed as a promise to refrain from in-
juring the good will of the business which defendant sold to
plaintiff."

See also Perkins v. Lyman, 9 Mass. 522; Davis v. Barney, 2 Md. (Gill & J.) 382; Collabella v. Naidech, 118 A. 259 (N. J.); Kradwell v. Thiesen, 131 Wis. 97, 111 N.W. 233; Old Corner Book Store v. Upham, 194 Mass. 101, 80 N.E. 228, 120 Am. St. Rep. 532; Tode v. Gross, 127 N. Y. 480, 28 N.E. 469, 13 L. R. A. 652, 24 Am. St. Rep. 475; Up River Ice Co. v. Denler, 114 Mich. 296, 72 N.W. 157, 68 Am. St. Rep. 480; Weickgenant v. Eccles, 173 Mich. 695, 140 N.W. 513; 36 Am. Jur., Monopolies, Combinations, and Restraints of Trade, page 550, section 73; and 17 C. J. S., Contracts, pages 776, 777, section 327d(3).

IV. To sustain the trial court's decree defendant argues the covenant is invalid because it provides defendant may operate the grocery store at 810 Main Street thus permitting competition within the time and area and that any enforcement would not be for protection of plaintiff but a penalty against defendant.

The authorities cited by defendant, Swigert & Howard v. Tilden, 121 Iowa 650, 97 N.W. 82, 63 L. R. A. 608, 100 Am. St. Rep. 374; Haggin v. Derby, 209 Iowa 939, 229 N.W. 257; Proctor v. Hansel, 205 Iowa 542, 218 N.W. 255, 58 A. L. R. 153; L. H. Henry & Sons v. Rhinesmith, 219 Iowa 1088, 260 N.W. 9; Brecher v. Brown, 235 Iowa 627, 17 N.W.2d 377; and Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405, do not reach the exact question before us, but do set out the principles in this type of case as well as those involved in the sale of a professional practice and in employer-employee cases.

In Swigert & Howard v. Tilden, supra, at page 660 of 121 Iowa, page 85 of 97 N.W., a case passing on the sufficiency of the petition to which defendant demurred, this court said:

"And the restriction must be reasonable, not oppressive, or out of proportion to the benefits which the vendee may, in reason, expect to flow from the restrictive features of the contract. * * * it would seem that the fair and full protection of the business and good will which the vendee has purchased and paid for may well be accepted as the test. Certainly the restriction ought not to be wider in the scope of its operation, and there can be no good reason for confining it to any narrower limits.

476

It follows naturally that each case must be governed in the main by its own facts."

The above was quoted at greater length in Haggin v. Derby, 209 Iowa 939, 943, 944, 229 N.W. 257, 259, with approval.

At the time the lease was drawn defendant operated two grocery businesses in Keokuk. He leased one to plaintiff and kept the other. No one would question his right to do this. Nor should there be any question of his right to contract not to compete with the one sold except in the other location. The one sold was a supermarket operation. The other was not, it was a smaller store with no available off-street parking. Defendant has now sold the smaller store to the parent company of plaintiff, no question of that sale contract is involved. The evidence bearing on the Big G operation is that it is a supermarket with one quarter of a block off-street parking immediately across the street. It is approximately 12 blocks from plaintiff's store, the 810 Main Street store is six blocks from plaintiff. The evidence shows the patrons of supermarkets drive to the store and expect free parking facilities. The display area in Big G is at least 2000 square feet larger than the 810 Main Street store and may be as much as 6000 square feet larger.

A fair construction of the intention of the parties is that they intended to eliminate supermarket competition allowing defendant one store other than a supermarket. As sustaining this construction, see Haggin v. Derby, suprá, at pages 945, 946 of 209 Iowa, page 260 of 229 N.W. The protection plaintiff asks is from supermarket competition. Defendant is competing with plaintiff on that basis in the Big G. To grant plaintiff relief would not penalize defendant any further than his agreement. Plaintiff purchased that much protection. True it is only partial protection but that is the contract. No question of defendant's right to compete in a store other than a supermarket is involved and what is said here bears only on his right to compete in a supermarket operation.

Plaintiff did produce evidence showing a decline in gross sales of approximately $15,000 since the opening of Big G compared with the same period the year before. It is not necessary to prove specific damages. Loss and damage are presumed

except in employer-employee contracts where the nature of the new employment is such that there is no danger of loss to the former employer's business. Cogley Clinic v. Martini, 253 Iowa 541, 549, 112 N.W.2d 678, 682; and Mutual Loan Co. v. Pierce, 245 Iowa 1051, 65 N.W.2d 405. And see quotation from Wilson v. Delaney, 137 Iowa 636, 641, 113 N.W. 842, 844, supra, in Division III.

V. Under the record plaintiff is entitled to a decree enjoining defendant T. A. Ginsberg from taking part in any degree in the management of the Big G Discount Store in Keokuk, Lee County, Iowa, or in any manner contacting suppliers, distributors or wholesalers of said Big G for the purpose of discussing or negotiating prices or purchases for said store, or in any manner discussing, advising or purchasing advertising for said store with anyone or firm or representative thereof selling advertising to said store, and further enjoining said defendant from in any manner arranging or directing the arrangement of merchandise in said store other than fruits and vegetables sold by him to said store, from making any retail sales in said store, from being in or on the premises occupied by Big G except as required in the sale by him of fruit and vegetables to said store, and from in any manner competing with plaintiff, all so long as plaintiff occupies the premises on which the Uptown Food Store, Inc., is located pursuant to any valid renewal of the original lease.—Reversed and remanded.

All JUSTICES concur.