J. Faulkner THOMAS, Appellee,

v.

THOMAS TRUCK AND CASTER COMPANY, Appellant.

No. 2–56622.

Supreme Court of Iowa.

April 16, 1975.

Bell & Hansen, New London, for appellant.

Deitchler, Thomas, Lawse & Saunders, Fort Madison, for appellee.

Heard by MOORE, C. J., and MASON, LeGRAND, REYNOLDSON and HARRIS, JJ.

REYNOLDSON, Justice.

The sole issue in this case is whether the plaintiff, J. Faulkner Thomas, breached an agreement made with defendant Company and resultantly forfeited a contractual right to lifetime payments of $20,000 per year and related life insurance benefits. Trial court held there was no breach. We agree.

The facts before us are uncontroverted. Thomas, 76 years old at trial, founded the Company in 1937. In 1955 he sustained a heart attack and was thereafter only semi-active in the business. His son Walter became the managing officer. In 1963 Thomas had a stroke.

July 15, 1968, Walter, acting as his father's agent, contracted to sell the latter's majority stock interest for a large sum of money to John F. Raney. In this instrument, Walter obtained a two-year option to purchase 100 percent of the stock of Buffalo Caster and Wheel Company, a wholly-owned subsidiary.

The sales agreement provided "in further consideration of the transfer" Thomas would be retained on the payroll,

" * * * at a consideration to be paid sufficient to assure the continued participation of Mr. J. Faulkner Thomas in and to certain life insurance policies * * * which said policies require the employment of the said J. Faulkner Thomas as a prerequisite coverage afforded under the policies, in a yearly compensation determined under the terms of the * * * contracts * * *."

This agreement was "[s]ubject to the preparation and execution of a more detailed and formal agreement" and to "the preparation of necessary collateral documents."

There followed on October 28, 1968, a written "agreement" between the Company and Thomas. Thomas agreed "to act as advisor and consultant" to the Company for so long as he lived, and as chairman of the board of directors for so long as the Company desired. Thomas further agreed "not to engage as consultant or otherwise to any competitor" of the Company. In consideration of the foregoing promises, the Company agreed to pay Thomas $20,000 per year for so long as he lived. This was apparently the amount required to keep in force $37,500 in coverage for Thomas under certain executive group life policies.

Pursuant to the July 15, 1968 sales agreement, Walter, the son, was retained by the Company as vice president and general manager. At some subsequent time his services were terminated. May 1, 1969 Walter exercised his option to acquire Buffalo Caster and Wheel Company, which was thereafter in direct competition with defendant Company until Buffalo went out of business in April 1972. Walter was at all times subsequent to May 1, 1969, president and principal stockholder of Buffalo.

From May 1, 1969 through April 1972, Thomas co-signed one $90,000 promissory note with Walter and made gifts and loans to him totaling $54,683.65. Thomas paid $30,000 on the $90,000 note and as surety stands liable for a $20,000 balance due on that indebtedness. Of the money advanced to his son Walter by Thomas, $30,500 was in the form of loans and the balance was a gift. Walter used most of the money so advanced in the business of Buffalo, as Thomas knew.

Thomas suffered from poor health. He was called upon only three or four times to advise or consult the Company. His testimony he had at all times held himself available for consultation was not disputed. There was no evidence he advised or consulted Buffalo or any of its officers.

The Company terminated its $1666 monthly payments to Thomas January 31, 1972. February 9, 1972 the Company sent Thomas written notice it would not make future payments, charging he had breached their agreement. Thomas filed suit for specific performance of the contract and later amended to ask for damages. Jury was waived. The cause was tried in equity.

Trial court awarded Thomas damages of $31,062.53 (unpaid installments with five percent interest) and specific performance of the contract, including maintenance of the insurance policies.

■■ I. This matter was tried below in equity and our review is therefore *de novo.* Buda v. Fulton, 261 Iowa 981, 985, 157 N.W.2d 336, 338 (1968). In any event, the facts are conceded and we are confronted with the construction of a contract, a matter of law for the court. C & J Fertilizer, Inc. v. Allied Mutual Insurance Company, 227 N.W.2d 169 (Iowa 1975); Farmers Insurance Group v. Merryweather, 214 N.W.2d 184, 187 (Iowa 1974).

II. Trial court found the second agreement constituted part of the original sales agreement and was in fact part of the consideration for the stock sale. As such, trial court found the case law dealing with covenants not to compete, ancillary to the sale of a business, more applicable than case law relating to obligations imposed upon employees to be faithful to employers.

Appealing, the Company asserts this finding was unjustified, that Thomas' conduct should be measured by the rule requiring a corporate employee to act at all times in the interest of his employer. Holden v. Construction Machinery Company, 202 N.W.2d 348, 364 (Iowa 1972) and citations. The burden is upon the employer to show disobedience, misconduct, incompetence or other justification for a valid dismissal for cause. LaFontaine v. Developers & Builders, Inc., 261 Iowa 1177, 1187, 156 N.W.2d 651, 658 (1968); see Holden v. Construction Machinery Company, supra at 364.

Thomas asserts the second agreement, properly interpreted, was a covenant not to compete given in connection with the sale of a business. He thus seeks to bring himself within the protection of a number of decisions, hereinafter cited, holding financial assistance to a competitor, standing alone, will not violate such covenants.

III. As above noted, the court must determine the actual significance and proper legal meaning of the parties' agreement. Extrinsic evidence which throws light on the situation of the parties, the antecedent negotiations, the attendant circumstances and the objects they were thereby striving to attain is regarded as relevant. C & J Fertilizer, Inc. v. Allied Mutual Insurance Company, supra at 172; Hamilton v. Wosepka, 261 Iowa 299, 306, 154 N.W.2d 164, 168 (1967).

And as the parties have discerned, the determinative issue is whether the agreements more nearly relate to an employment contract or to a covenant not to compete. It is true the contract, once classified, affects our perspective in a given situation. Where there is an employer-employee contract we examine an employee's conduct to determine whether he or she has done something hostile to his or her master's interests. See LaFontaine v. Developers & Builders, Inc., supra, 156 N.W.2d at 658; Miller v. Jones, 178 Iowa 168, 172, 159 N.W. 671, 672 (1916). In the sale-related covenant not to compete cases we do not apply a "strict construction" as appellee asserts, but do hold the contract, being in restraint of trade and personal liberty, should not be construed beyond its fair import. Uptown Food Store, Inc. v. Ginsberg, 255 Iowa 462, 467, 123 N.W.2d 59, 62 (1963).

Examining the record, we find little to indicate the parties were concerned with any employee services Thomas might render after the sale. His age and frail health caused him to be only "semi-active" before the sale and would reduce his work capacity. The amount ultimately fixed for his annual compensation was the precise amount required to maintain his life insurance coverage. No one testified the sum had any relationship to Thomas' anticipated services. The second agreement provided for his unilateral right to retire at any time, which suggests the Company did not place any significant value on consultation with Thomas.

The intention of the parties is further discerned by their actions subsequent to the second agreement. Thomas was consulted by the Company only three or four times. He sat as a board chairman at the first post-sale meeting and thereafter was not even notified when board meetings were held. Following the sale Thomas spent seven to eight months each year in Florida.

Finally, the attendant circumstances surrounding this transaction (involving almost one-half million dollars) discloses a father being paid a large sum of money while his son was granted an option to purchase a wholly-owned subsidiary corporation equipped to produce competing products. If financial aid to the son loomed as a substantial factor, we infer an attempt would have been made to directly treat the subject in the controlling instruments. Instead, we have only the restriction the father not "engage as consultant or otherwise."

The most logical conclusion to be drawn from these facts is that the parties intended

to provide an annuity-type contract in partial payment for Thomas' stock, with any employment aspect a relatively insignificant factor, although of course Thomas was obligated to provide consultation to the Company and to refrain from providing such services to competitors. See Stauter v. Walnut Grove Products, 188 N.W.2d 305, 310–11 (Iowa 1971).

The following statement concerning the covenant not to compete accurately reflects the applicable case law:

"Where the covenantor has agreed that he will not, directly or indirectly, engage in a particular business or activity, it has been decided that the covenant is not breached by his giving a loan or extending credit to another to be used in engaging in such business or activity, on the ground that the act of giving a loan or credit is not 'engaging in business' or activity as such. It has also been held that such a covenant is not violated by rendering financial assistance to another if the competing business or activity is not in effect being operated by the covenantor himself in another form, that is, if he has no ownership interest in it and derives no profit from it."

Annot., Rendering Financial or Other Assistance to Another as Breach of Covenant Not to Compete, 1 A.L.R.3d 778, 782; see Slate Company v. Bikash, 343 Mass. 172, 177 N.E.2d 780 (1961); Buckingham Tool Corporation v. Evans, 35 Mich.App. 74, 192 N.W.2d 362 (1971); Gallup Electric Light Co. v. Pacific Improvement Co., 16 N.M. 86, 113 P. 848 (1911); 54 Am.Jur.2d, Monopolies, Restraints of Trade, and Unfair Trade Practices § 575, p. 1002.

In the only Iowa decision involving such a covenantor financing a competitor, the covenantor also "performed substantially all of the services of a manager or owner on a daily basis." Uptown Food Store, Inc. v. Ginsberg, supra, 255 Iowa at 473, 123 N.W.2d at 66. In holding the covenant not to compete was thus breached the *Uptown Food Store* court referred to Gallup Electric

Light Co. v. Pacific Improvement Co., supra, which held financing alone does not breach such a covenant, stating, "The *Gallup* case only holds financing does not violate the covenant not to compete." *Id.* The Iowa court apparently thus drew a line between the *Gallup* situation and one in which the covenantor not only provided financial assistance but participated in other activity for the benefit of a competing business.

■ The rationale behind the "financing only" rule is based primarily upon protection of the good will normally transferred in connection with the sale of a going business. Thus, those activities which impair the value of the good will, e. g., use of covenantor's name or expertise, or covenantor's efforts to draw old customers, would normally violate the covenant. See Slate Company v. Bikash, supra, 177 N.E.2d at 782.

■ In the case *sub judice* there is no evidence of other than indirect financing involving gifts and loans from a wealthy father to a needy son. Neither is there evidence the loans and gifts received any publicity which might have influenced pre-sale customers of the Company.

Finally, the language of the covenant, "not to engage as consultant or otherwise," lends no direct support to the theory Thomas contracted away his right to make loans or gifts to his son, assuming such a provision would be valid as protecting a legitimate interest of the Company.

We hold trial court correctly construed and applied the agreements.

Affirmed.