**Susie Ashcraft PITTS, Independent Executrix of the Estate of James Buford Ashcraft, III, Deceased, and Kreidler-Ashcraft Funeral Directors, Inc., Appellants,**

v.

**Dorothy K. ASHCRAFT, Appellee.**

**No. 1444.**

Court of Civil Appeals of Texas, Corpus Christi.

Aug. 30, 1979.

Rehearing Denied Sept. 21, 1979.

James H. Denison, Jr., Denison & Mann, Harlingen, for appellants.

Wm. L. Hubbard, Bonner & Bonner, Harlingen, for appellee.

## OPINION

NYE, Chief Justice.

This suit for damages and other relief is predicated upon the terms of a property settlement agreement executed by Dorothy K. Ashcraft, Appellee, and her late, former husband James Buford Ashcraft, III, which was incorporated into their divorce decree. Mrs. Ashcraft filed suit, alleging that the executrix of her former husband's estate had refused to accept and pay to her claims against his estate which were authorized by the terms of the agreement. The executrix, Susie Ashcraft Pitts, Appellant, answered on behalf of the Estate, and filed a cross-action seeking to recover certain insurance proceeds previously paid to Mrs. Ashcraft by an insurer, allegedly in contravention of the agreement. Kreidler-Ashcraft Funeral Directors, Inc. (Kreidler-Ashcraft), also an appellant, intervened alleging that it was the third-party beneficiary to a non-competition covenant contained in the property settlement agreement, which Mrs. Ashcraft had breached. After a non-jury trial, the trial judge entered judgment in favor of Mrs. Ashcraft, denying all affirmative relief sought by the Executrix and Kreidler-Ashcraft. The court filed findings of fact and conclusions of law in support of his judgment. The executrix, on behalf of the Estate, and Kreidler-Ashcraft appealed.

Mrs. Ashcraft and James Buford Ashcraft, III (J. B.) were married in 1935. Three children were born of their marriage, Susie Ashcraft Pitts, (Executrix and Appellant herein), Mary Louise Ashcraft and James Buford Ashcraft, IV (Buck). In 1943, Mr. and Mrs. Ashcraft moved to Harlingen, Texas, and started a funeral home business (Kreidler-Ashcraft), in which they were the shareholders. On July 18, 1975, Mrs. Ashcraft and J. B. Ashcraft executed a "Separation and Property Settlement Agreement in Contemplation of Divorce" which was approved and incorporated into their divorce decree. The agreement, in substance, provided for the specific division of the community estate of Mrs. Ashcraft and J. B. Mrs. Ashcraft received, among other property, title to the community residence and certain periodic payments, while J. B. received title to all of the shares of Kreidler-Ashcraft, in addition to other specified property. The present dispute between the parties before this Court concerns the following three paragraphs of the agreement:

"VII PERIODIC PAYMENTS

(b) . . . Husband hereby agrees to pay all premiums which may become

due following the entry of any Decree of Divorce herein on a certain insurance policy on his life, the same being Policy No. CA2997 of the Lincoln Liberty Life Insurance Company which provides for Fifty Thousand Dollars ($50,000.00) in life insurance benefits to be paid to Wife as the beneficiary in the event of the death of Husband. On the execution of this Agreement and a Final Decree of Divorce herein approving the same, Husband agrees to take all action necessary to name Wife as irrevocable beneficiary of the aforesaid policy and transfer the ownership and control of the policy to Wife.

If as a result of the Husband's failure to comply with the terms of this article, and the Husband dies prior to the Wife, and if the Wife does not receive the full amount of the policy, she shall have a claim against the estate of the Husband for such amount or for the difference between said amount and the proceeds she does not receive."

## "XIV

### NON–COMPETITION AGREEMENT

For and in consideration of this Agreement and the agreement of J. B. Ashcraft, III to pay to Dorothy K. Ashcraft the periodic payments described in Paragraph VIII above, Dorothy K. Ashcraft agrees that for a period of ten (10) years from the date of the divorce between the parties she will not engage in the funeral home or mortuary business anywhere in Cameron County, Texas. She will not become employed by any funeral home or funeral director, she will not invest any money or thing of value in any such enterprise, she will not allow her name to be used in connection with any such business, and she will not encourage or advise anyone else in connection with the operation of a funeral home or mortuary in this county."

## "XVI

### AGREEMENT TO DEVISE OR BEQUEATH PROPERTY

As further consideration . . . Husband hereby agrees to provide at his death for the Wife, if she is surviving, by devising or bequeathing a legal life estate only in favor of Wife in all shares of stock of Kreidler-Ashcraft Funeral Directors, Inc. owned by Husband at the time of his death. In the event Husband dies owning stock in Kreidler-Ashcraft Funeral Directors, Inc., with the Wife surviving, and Husband by his will does not create the aforementioned life estate . . . Wife shall have a claim against Husband's estate in an amount equal to One Hundred Thousand Dollars ($100,000.00)."

Approximately nine months after the agreement was executed and the divorce was granted, J. B. died from injuries he sustained in an accident. Thereafter, J. B.'s will was duly admitted into probate and Susie Ashcraft Pitts (daughter) was duly appointed Independent Executrix of the estate by the probate court. Under the provisions of the will, J. B.'s entire estate, including all real and personal property, was devised and bequeathed, in equal shares, to his daughters, Susie Ashcraft Pitts and Mary Louise Ashcraft. The will did not mention J. B.'s former wife, Mrs. Ashcraft, or his son, Buck. On June 23, 1976, Mrs. Ashcraft filed a claim for $200,000.00 in the Probate Court against J. B.'s estate based upon paragraphs VII(b) and XVI of the agreement above quoted. The claim was refused by the Executrix and thereafter, Mrs. Ashcraft filed this suit.

Mrs. Ashcraft plead that J. B. failed to bequeath to her a legal life estate in the shares of stock of Kreidler-Ashcraft he owned (pursuant to the provisions of paragraph XVI of the agreement), and the Executrix wrongfully denied her claim against the estate for $100,000.00, less $45,000.00, an amount Mrs. Ashcraft acknowledged having received from Kreidler-Ashcraft. Mrs. Ashcraft further alleged that J. B. had

failed to name her as irrevocable beneficiary on one certain life insurance policy mentioned in paragraph VII(b) of the agreement, and accordingly, she had a valid claim against the Estate in the amount of $100,000.00 (a sum equal to the double indemnity proceeds payable for accidental death), which was wrongfully refused by the Executrix. Mrs. Ashcraft prayed for the recovery of these sums, less the amount she had already been paid by Kreidler-Ashcraft, plus prejudgment interest and attorney's fees. Mrs. Ashcraft also sought a declaratory judgment that the non-competition clause contained in paragraph XIV of the agreement be declared void and unenforceable.

Susie Ashcraft Pitts, Independent Executrix, answered on behalf of the "Estate" and filed a cross-action seeking the recovery of $108,000.00, an amount previously paid by Mutual of Omaha Insurance Company to Mrs. Ashcraft, the named beneficiary on six insurance policies that were in force on the date of J. B.'s death. These policies were a part of the benefits set aside to J. B. under the agreement. Kreidler-Ashcraft intervened and, along with the Executrix, sought damages and injunctive relief, alleging that Mrs. Ashcraft had breached the non-competition clause contained in paragraph XIV of the agreement.

Prior to trial, the parties entered into lengthy stipulations as to certain facts and as to the admissibility of certain documents which were entered into evidence at trial. The substance of the stipulations relevant to this appeal were: 1) regarding Mrs. Ashcraft's allegations concerning her claims pursuant to paragraph VII(b) of the agreement, that, prior to his death, J. B. did not take action to name Mrs. Ashcraft as irrevocable beneficiary of that one certain policy named therein; that Kreidler-Ashcraft, the named beneficiary therein, had paid all of the premiums from the time of divorce to the time of J. B.'s death and had received insurance proceeds under the terms of the double indemnity provisions of the policy in a net amount of $82,993.99, after the insurance company had deducted the sum of $17,006.01, which represented an outstanding loan against the policy in the name of Kreidler-Ashcraft; 2) concerning Mrs. Ashcraft's claim pursuant to paragraph VIII(b) of the agreement, that J. B.'s will did not leave a life estate in favor of Mrs. Ashcraft in the shares of Kreidler-Ashcraft stock owned by J. B. at the time of his death; and 3) concerning the claims of the Executrix to previously described insurance policies, there remained six additional specified Mutual of Omaha Insurance Company policies carrying total insurance proceeds in the amount of $108,000.00 each of which, at the time of J. B.'s death, still named Mrs. Ashcraft as beneficiary and that Mrs. Ashcraft received such proceeds from the insurance company.

In addition to the other stipulations not mentioned herein, the parties presented extensive testimony and other documentary evidence in support of their respective claims, some of which will be discussed in more detail under the specific points of error below.

After hearing all of the evidence, the trial judge entered a judgment which awarded Mrs. Ashcraft the sum of $191,612.33. This included her claims totaling $165,000.00, pursuant to the terms of the agreement, prejudgment interest and the sum $15,000.00, as reasonable attorney's fees for the prosecution of her claims pursuant to the agreement. The trial court denied her request for a declaration that the non-competition clause was void and unenforceable and denied all affirmative relief sought by the Executrix and the Intervenor, Kreidler-Ashcraft.

The joint appellant's brief filed on behalf of the executrix and Kreidler-Ashcraft presents twenty-three points of error. Most of these points of error variously attack the trial court's failure to hold that Mrs. Ashcraft breached the non-competition covenant contained in the agreement. The remaining points of error complain of the trial court's failure to grant any of their requested affirmative relief.

The dispute concerning the alleged breach of the non-competition covenant

centers around the establishment of a funeral home in the city of Harlingen by "Buck" Ashcraft, the only son of Mrs. Ashcraft and her late husband. Buck's competing funeral home (incorporated under the name of Ashcraft Funeral Home, Inc.), opened for business on March 19, 1978. Buck testified that he had been engaged in various phases of the funeral home business, commencing at the age of ten, when he worked for his father at Kreidler-Ashcraft. Buck was employed by Kreidler-Ashcraft until sometime in February of 1975, when the relationship between Buck and his father deteriorated to the extent that Buck left the business. Thereafter, for the next year and one-half to two year period, Buck worked in various phases of the funeral home business in other locations. Buck testified that although he had previously considered the possibility of building a funeral home somewhere in Cameron County for some years, his decision to go ahead with such plans occurred sometime in March of 1976, the same month his father died. The record is replete with evidence concerning the details concerning the stages of Buck's progress in planning and completing his funeral home. The evidence showed that after J. B.'s death and prior to and during the construction of this new funeral home, Mrs. Ashcraft made a number of monetary gifts to Buck. It was not contested at trial that some of her gifts were subsequently used by Buck to establish his new funeral home. Included in such gifts were two promissory notes in which Mrs. Ashcraft was the named payee. She assigned the notes to Buck. He subsequently used the notes as collateral to obtain interim financing for the construction loans. Buck also used a cash gift he received from his mother to be applied to the purchase price for land necessary for the construction site.

The trial court's findings of fact concerning the non-competition clause were contained in one paragraph of the judgment, which we have grouped by sentence as follows:

1. "During the planning and construction phase of the funeral business operated by her son, and on other occasions, Plaintiff (Mrs. Ashcraft) made gifts to him (Buck) in the form of cash."

2. "Some, but not all, of these cash gifts were subsequently used by plaintiff's son (Buck) to purchase land and other supplies and materials for the construction and operation of Buck Ashcraft Funeral Directors, Inc." (sic)

3. "At the time that such gifts were made, Plaintiff knew or should have known that some of the cash gifts would be used by her son as set out herein, but such gifts were not made with the motive to violate the non-competition agreement in question."

4. "Plaintiff did not invest any money or thing of value in such enterprise, has not allowed her name to be used in any way in connection with such business, nor has she encouraged or advised her son (Buck) or anyone else in connection with the operation of a funeral home or mortuary in Cameron County, Texas."

In point of error number one, Appellants complain that, as a matter of law, Mrs. Ashcraft breached the non-competition covenant by giving her son cash and notes with the knowledge that they would be used to establish a competing funeral home. Appellants are arguing, in effect, that the trial court's finding that Mrs. Ashcraft gave cash gifts to her son with the knowledge that he would use them to engage in a competing funeral home business violates that portion of the non-competition clause which states that Mrs. Ashcraft "will not encourage or advise anyone else in connection with the operations of a funeral home or mortuary." The negative findings contained in finding 4 quoted above, however, substantially track the language of this portion of the non-competition clause in question, and in effect, absolve Mrs. Ashcraft of the charge that she engaged in such competitive activity. Although not directly raised, implicit in Appellants' contentions is the argument that findings of fact 1, 2, and 3 above conflict with finding of fact 4 above.

In support of this point of error, Appellants first contend that the non-competition clause in question is sufficiently broad to prevent, not only direct competition by Mrs. Ashcraft herself, but also broad enough to prohibit acts on her part which would have the effect of encouraging or aiding other persons, including her son Buck, who might wish to engage in such competition. Although Appellants make some general arguments to the effect that Mrs. Ashcraft breached all of the prohibitions contained in the non-competition clause by her monetary gifts to Buck, the crux of the dispute between the parties is the issue of whether or not, under the circumstances, such gifts violated that portion of the non-competition clause in which Mrs. Ashcraft agreed not to *encourage or advise anyone else in connection with the operation of a funeral home business.*

■ In Texas, and in the majority of the other jurisdictions, mere loans or gifts of money to a person engaged in a similar business, without more, are not a breach of a non-competition covenant in which the covenantor agrees not to engage, either directly or indirectly, in such competing business. Cf. *Owen v. Willis*, 20 S.W.2d 338, 340 (Tex.Civ.App.—Amarillo 1929, writ dism'd). See: e. g., *Buckingham Tool Corp. v. Evans*, 35 Mich.App. 74, 192 N.W.2d 362 (1971); *Thomas v. Thomas Truck & Caster Co.*, 228 N.W.2d 52 (Iowa 1975); *Slate Co. v. Bikash*, 343 Mass. 172, 177 N.E.2d 780 (1961); *Adams v. Adams*, 156 Neb. 778, 58 N.W.2d 172 (1953); Annot., Rendering Financial or Other Assistance to Another as Breach of Covenant not to Compete, 1 A.L. R.3d 778, § 3(a), pp. 783–785 (1965). The rationale underlying this result is generally that the covenantor does not engage in or become interested in the competing business, nor does he adversely affect the sale of good will, by merely rendering financial assistance to the competitor. Generally, therefore, in order for the breach of such a covenant to occur, the covenantor must also undertake a more active participation in the competing enterprise, such as giving the competitor the benefit of his experience, knowledge, and/or influence to assist the competitor in the conduct of his competing business, in addition to rendering financial assistance. See Annot., Rendering Financial or Other Assistance to Another as Breach of Covenant not to Compete, 1 A.L. R.3d 778, § 3(b), pp. 785–86 (1965), and authorities cited therein.

None of the parties has cited a single Texas case or a case from any other jurisdiction which even considers the question of whether or not gratuitous financial assistance alone violates a non-competition clause wherein the covenantor has agreed not to "encourage" another to engage in a competing business. Although our research also has not revealed a case exactly on point, a similar non-competition covenant (wherein the covenantor who sold his business agreed not to "aid and advise . . . or influence any person . . . to so compete") was considered in *Barrett v. Curtis*, 407 S.W.2d 359 (Tex.Civ.App.—Dallas 1966, no writ). In that case, the Court found that there was ample evidence to support the jury's finding to the effect that such covenant had been breached, including evidence: 1) that after the sale, covenantor's brother established the only other competing business in town in a place of business owned by the covenantor; 2) that the covenantor leased additional space to his brother and received rental income therefrom; 3) that various people employed by the covenantor also participated in the conduct of his brother's competing business; 4) that the covenantor personally signed his brother's note at the bank for the purchase of additional equipment; 5) that the covenantor's name was used in conjunction with the competing business; and 6) that the purchaser subsequently went out of business. See *Barrett v. Curtis*, 407 S.W.2d at 362–63. Certainly, the covenantor in *Barrett* rendered much more than mere financial assistance to his competing brother.

■ As a general rule, negative covenants, such as the one before us, are to be closely scrutinized. A restrictive covenant not to compete must be reasonably necessary, must not be oppressive, and must not

be broader than the business sold. The covenant, to be enforceable, must not impose a greater restraint than is reasonably necessary to protect the business conveyed. The reasonableness of a restrictive covenant is generally a question of law. *Weatherford Oil Tool Co. v. Campbell*, 161 Tex. 310, 340 S.W.2d 950 (1960). See also *Justin Belt Co., Inc. v. Yost*, 502 S.W.2d 681 (Tex.Sup. 1973).

■■ Where, as here, neither party has alleged that the contract is vague or ambiguous, the construction of the contract is a question of law for the court. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.Sup.1968). In such a situation, the courts will give effect to the intention of the parties as expressed or as it is apparent in the writing. In the usual case, the instrument alone will be deemed to express the intention of the parties for it is the objective, not subjective intent that controls. *City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex. Sup.1968).

■ Buck was not a party to the non-competition clause, nor was he ever required to sign a non-competition clause as a condition of his prior employment with Kreidler-Ashcraft. The language of the non-competition covenant, "not to encourage or advise anyone else," lends no direct support to the theory that Mrs. Ashcraft contracted away her right to make gifts to her son, assuming such a provision would be valid as protecting a legitimate interest of the Kreidler-Ashcraft Funeral Directors, Inc. If financial gifts to the son loomed as a substantial factor, we infer that an attempt would have been made to directly treat that subject in the non-competition clause. Covenants in restraint of trade do not rest upon inference. The agreement will not be extended by implication, and it will be construed in favor of rather than against the interests of the covenantor. *Houston Transfer & Carriage Co. v. Williams*, 221 S.W. 1081 (Tex.Com.App.1920, holdings app.); *Seline v. Baker*, 536 S.W.2d 631, 634 (Tex.Civ.App.—Houston (1st Dist.) 1976, no writ); *Texas Shop Towel Inc. v.*

*Haire*, 246 S.W.2d 482 (Tex.Civ.App.—San Antonio 1952, no writ). Appellants' point of error one is overruled.

■ Appellants' points of error, two and three are, in effect, legal and factual sufficiency points which contend that 1) the undisputed evidence established as a matter of law that Mrs. Ashcraft encouraged her son in connection with the operation of his funeral home business, and that she had invested things of value in such enterprise, and 2) that the trial court's findings to the contrary are against the great weight and preponderance of the evidence. These points of error direct our attention to other evidence, including the cash gifts which, the appellants contend, show that Mrs. Ashcraft did encourage her son in contravention to the non-competition clause in question.

In considering Appellants' legal sufficiency points, we, of course, must review the evidence in its most favorable light, considering only the evidence and reasonable inferences drawn therefrom in support of the judgment and disregarding all evidence and inferences to the contrary. *Garza v. Alviar*, 395 S.W.2d 821 (Tex.Sup.1965). In deciding Appellants' insufficient evidence points, this Court is required to consider all of the evidence. *In Re King's Estate*, 150 Tex. 662, 244 S.W.2d 660 (1951).

The substance of the relevant testimony is to the effect that Mrs. Ashcraft's monetary gifts to Buck were not given to him for any particular purpose, and that such gifts were given to him without restrictions. There is evidence that Mrs. Ashcraft also gave substantial gifts to her daughters, including tuition and living expenses for Mary Louise during the time she attended school at Southern Methodist University, and a trip to Europe for Susie Ashcraft Pitts and her husband.

Mrs. Ashcraft stated that Buck had mentioned the possibility that he might use her gifts to establish a funeral home business, and that she had told him "If you do, it's on your own." She further told him that she would not participate in his business venture. Mrs. Ashcraft testified that she had

not participated in his business venture, nor given Buck advice on how to run his business. She further stated that she did not work for her son; she did not own any shares of stock in her son's corporation; she had never personally guaranteed any of her son's debts; she had not underwritten his business venture, and that she did not know that her son would borrow money on the notes that she had given to him. Buck testified, in substance, that his mother was not involved in his business venture in any manner, was not an employee, a creditor, a shareholder, or an advisor.

Susie Ashcraft Pitts, Mrs. Ashcraft's daughter and appellant herein, admitted that she had no personal knowledge: 1) that her mother had ever been employed by Buck's funeral home; 2) that her mother had ever invested money or anything of value in Buck's funeral home; or 3) that her mother had ever given Buck any encouragement or advice in connection with the operation of his business. She further stated that no one had ever told her that Mrs. Ashcraft had done any of these things in furtherance of Buck's funeral home business.

The record as a whole in this case demonstrates to us that Mrs. Ashcraft did virtually everything within her power to comply with the non-competition covenant in question. Although there is some evidence that Mrs. Ashcraft knew or had reason to know that her son intended to open a competing funeral home business, and the trial court so found, there is no evidence in the record that she did anything to further her son's objectives, other than to give him cash gifts. Neither is there evidence that these gifts received any publicity connecting Mrs. Ashcraft to her son's new business venture in any manner. Thus, those activities which impair the value of goodwill, e. g., the use of the covenantor's name or expertise, or covenantor's efforts to draw old customers, are no present in this case. We pause to note that Mrs. Ashcraft's late husband and the father of Buck disinherited his only son and gave everything he had to his two other children (one of which was the appellant, the executrix of his estate).

It would follow that the mother could give gifts to her son out of her portion of her estate as a natural act and not as one in contravention of the covenant not to compete or encourage competition. Compare *Slate Co. v. Bikash*, 343 Mass. 172, 177 N.E.2d 780 (1961).

We conclude that there is ample evidence in the record to support the trial court's findings that Mrs. Ashcraft had not encouraged her son in connection with the operation of his funeral home business, and had not invested any money or thing of value in such enterprise, and such findings are not against the great weight and preponderance of the evidence. Appellants' points of error two and three are hereby overruled.

In points of error eight and nine, the Appellants attempt to attack the trial court's alleged "implied findings" that the non-competition covenant is unreasonable and unenforceable on legal and factual sufficiency points of error. These contentions find no support in the record. Although Mrs. Ashcraft's trial pleadings alleged that the non-competition covenant was supported by no consideration and also that it was unenforceable as against public policy, the trial court made no findings in this regard, and the trial court's judgment denied all further relief not expressly granted therein. Mrs. Ashcraft abandoned her initial appeal, which was predicated upon the proposition that the non-competition clause was void and unenforceable. Appellants sought an injunction in the trial court to enforce the non-competition agreement, which was also denied by the trial court in its final judgment. The issue of whether or not the non-competition covenant is enforceable or unenforceable per se is not before us at this time. Appellants' points of error eight and nine are accordingly overruled.

We fail to see the materiality of the findings which Appellants attack on legal and factual sufficiency grounds in points of error four through seven. Appellants' arguments and authorities applicable to these points of error fail to bring forward any

theory upon which this particular finding would be material to the controlling issues of this case or to the trial court's judgment. Accordingly, Appellants' points of error four through seven are hereby overruled.

Points of error ten through seventeen are predicated upon the proposition that Mrs. Ashcraft breached the non-competition covenant in question. Our disposition of the prior points of error renders these points of error immaterial, and they are also overruled.

The Executrix's cross-action sought, in part, a declaration that the estate, and not Mrs. Ashcraft, was entitled to receive the proceeds of the Mutual of Omaha Life Insurance policies. The trial court found: 1) that the Mutual of Omaha Life Insurance policies in question were part of the benefits set aside to Mrs. Ashcraft's deceased husband in the agreement; 2) that at the time of J. B.'s death, Mrs. Ashcraft was the named beneficiary on each policy; and 3) that J. B. had not taken any action to change the beneficiary, although he had a right to do so. Based on these findings, the trial court concluded that Mrs. Ashcraft was entitled to keep the proceeds of the Mutual of Omaha Life Insurance policies. We agree.

The Executrix contends, in point of error number eighteen, that the trial court erred as a matter of law by failing to render judgment in favor of the Executrix in the amount of the policy proceeds as an offset against any liability of the Estate to Mrs. Ashcraft. In the alternative, the Executrix contends in point of error nineteen, that the trial court erred by failing to award the Estate one-half of the proceeds paid to Mrs. Ashcraft on such policies. The executrix argues that Mrs. Ashcraft relinquished her "right," as beneficiary, to receive the proceeds of such insurance policies by the express terms of the agreement. The executrix relies upon the terms of the preamble to the agreement which provides, in relevant part, as follows:

"The following Agreement is entered into . . . in contemplation of divorce for the purpose of finally determining all property rights, tangible or intangible, vested or future, and for the purpose of finally determining all rights, duties, and obligations, including inchoate marital rights, which may have arisen because of the marital or family relationship (or which are attributable to property transfer, directly or indirectly, pursuant to this Agreement) . . . ."

Appellant contends that the trial court's finding that such insurance policies were part of the benefits set aside to Mrs. Ashcraft's deceased husband, when considered in conjunction with the above preamble is sufficient to constitute a relinquishment of Mrs. Ashcraft's contingent interest as a named beneficiary under the insurance policies. We disagree.

As a general rule where, as here, the insured reserves the right to change the beneficiary in an insurance policy, the beneficiary therein obtains no vested interest in the proceeds of the policy prior to the death of the insured. The insured may change the beneficiary at will, and thereby divest a prior beneficiary of all interest in the proceeds of the policy. *Volunteer State Life Ins. Co. v. Hardin*, 145 Tex. 245, 197 S.W.2d 105 (1946); *Box v. Southern Farm Bureau Life Ins. Co.*, 526 S.W.2d 787 (Tex.Civ.App.—Corpus Christi 1975, writ ref'd, n.r.e.). In Texas, former spouses retain an insurable interest in each other's lives even though their marriage has been dissolved. *McCain v. Yost*, 155 Tex. 174, 284 S.W.2d 898 (1955); *Scherer v. Wahlstrom*, 318 S.W.2d 456 (Tex.Civ.App.—Fort Worth 1958, writ ref'd). Tex.Ins.Code Ann. Art. 3.49–1 (1963).

A contention similar to the one before us was rejected in *Partin v. deCordova*, 464 S.W.2d 956 (Tex.Civ.App.—Eastland 1971, writ ref'd). In that case, the former wife and widow of the deceased insured both claimed the right to receive the proceeds of certain insurance policies insuring the life of the decedent. The widow's claim was based upon a property settlement agreement between the decedent and the former wife, which had been incorporated into the divorce decree. The former wife,

however, claimed the proceeds in question on the basis that she was the named beneficiary in the policies. The appellate court rejected the widow's contention that all interest in the insurance policies, including their prospective proceeds, constituted community property which was relinquished by the former wife and vested in the husband as his separate property by the terms of the settlement agreement without the need of any technical change of beneficiary in the policies. In support of its holding that the former wife was entitled to receive the proceeds of the insurance policies, the court stated as follows:

"We cannot agree with [widow's] contention, in effect, that [former wife] by the settlement agreement not only surrendered her community property rights in the policies in question, but that such settlement also had the effect of destroying her rights as to the designated beneficiary under such policies. While it is true that [former wife] surrendered her community interests in the policies, the deceased . . ., as the owner of such policies had the right to change or retain the beneficiaries named therein. He did not exercise his right to change the beneficiary. Since [former wife] had an insurable interest and continued to be the named beneficiary under the policies, she was entitled to the proceeds thereof at deCordova's death." (citations omitted). *Partin v. deCordova*, 464 S.W.2d 956 (Tex. Civ.App.—Eastland 1971, writ ref'd).

Courts in other jurisdictions have reached varying results when considering the issue of whether the designated beneficiary of an insurance policy, in spite of such designation, has relinquished the right to receive the policy proceeds upon the insured's death, pursuant to the terms of such property settlement agreement, depending relevant statutes and the specificity of the agreement in question. Appellant concedes that there is no Texas authority concerning the precise issues before us, and we have found no controlling Texas authority. Appellant relies primarily upon the cases of *Hollaway v. Selvidge*, 219 Kan. 345, 548 P.2d 835 (1978); *O'Brien v. Elder*, 250 F.2d

275 (5th Cir. 1959); and *Spalding v. Williams*, 275 Wis. 394, 82 N.W.2d 187 (1957). We have examined each of these authorities and find they are distinguishable or are not controlling. In each instance either 1) the cited case is directly contrary to the writ refused case (*Partin v. deCordova*, supra); or 2) the property settlement agreements in question contained provisions in which the parties specifically relinquished their rights to the property awarded to the other spouse or their right to set up any claim to any of the property awarded to the other spouse. The general rules which Texas seems to follow have been stated as follows:

"The wife may, upon divorce, contract away any rights in insurance on her husband's life in which she is named as the beneficiary. *General expressions or clauses in a property settlement agreement between a husband and wife, however, are not to be construed as including an assignment or renunciation of expectancies, and a beneficiary therefore retains his status under an insurance policy if it does not clearly appear from the agreement that in addition to the segregation of the property of the spouses, it was intended to deprive either spouse of the right to take under an insurance contract of the other*, and while the failure of the husband to exercise his power to change the beneficiary ordinarily indicates that he does not wish to effect such a change, each case must be decided upon its own facts." (Emphasis added). 4 Couch on Insurance § 27:114, p. 655 (1960).

We are of the opinion that the terms of the agreement before us fail to show that the parties intended to renounce Mrs. Ashcraft's contingent rights, as the named beneficiary, to receive the insurance proceeds in question. Appellant's points of error eighteen and nineteen are hereby overruled.

■ In point of error number twenty, Appellant contends that the trial court erred in awarding Mrs. Ashcraft $100,000.00 pursuant to paragraph VIII(b), less the sum of $45,000.00 she had previously received,

because her claim under this paragraph was limited to $50,000.00, the face amount of the Lincoln Liberty Life Insurance policy in question. Appellant contends that the phrase, "for such amount," refers to the face amount of the policy, and does not include the double indemnity benefits. We do not agree.

It is quite apparent to us from the express provisions of this paragraph that the parties intended for J. B. to name Mrs. Ashcraft as the irrevocable beneficiary on this particular policy. In such event, she would receive the proceeds as paid by the insurance company, whether such amount equalled $50,000.00 the face amount of the policy or $100,000.00, the double indemnity amount payable in the event of accidental death. If, at the time of death, Kreidler-Ashcraft had an outstanding loan against the insurance policy, and the insurance company paid the beneficiary less than the full amount, the parties to the agreement intended for Mrs. Ashcraft not to be prejudiced thereby, but rather, to receive the full amount of the policy she otherwise would have received. Appellant's construction of the paragraph is a strained one which focuses on one phrase without reference to all of the provisions of the policy as a whole. Appellant's point of error twenty is overruled.

The trial court's judgment also awarded Mrs. Ashcraft $15,000.00 as reasonable attorney's fees. In support of this award, the trial court found, in substance, that Mrs. Ashcraft was entitled to collect reasonable attorney's fees because she was required to hire an attorney to collect the amounts to which she was entitled under provisions of the agreement. The trial court found that Mrs. Ashcraft was not entitled to attorney's fees for her attorney's efforts expended in defending Mrs. Ashcraft against the Appellants' cross-actions.

In point of error twenty-three, the Appellants contend that the trial court erred in awarding Mrs. Ashcraft attorney's fees in any amount because there is "no evidence" in this case allocating the time spent by the attorneys for Mrs. Ashcraft to the presentation of her claims against the Executrix and to the time spent in defense of the claims asserted by the Executrix and Kreidler-Ashcraft. We disagree.

Contrary to Appellants' assertions, there is ample evidence in the record of time allocated by Mrs. Ashcraft's attorneys solely to the recovery of her claims under the agreement. The original record, as well as a typed summary, of the time records kept by her attorneys was admitted into evidence. Although all of the listed items do not specifically set forth the exact nature of the work performed, most of the items do specify the particular issues of the case and the corresponding time spent on each issue. Much of the actual time spent was in the courtroom in front of the trial judge who was certainly in a position to determine what portion of the trial time was spent for what purpose. One of Mrs. Ashcraft's attorneys testified, in addition, that a reasonable fee for the prosecution of such a collection case would be a one-third contingent fee, and that Mrs. Ashcraft was being charged on this contingency basis.

The remaining points of error, twenty-one and twenty-two attack the trial court's action of granting Mrs. Ashcraft's motion to file a post-trial amendment to her pleadings naming as defendant, Susie Ashcraft Pitts, Independent Executrix of the Estate of the decedent, over Appellants' motion to dismiss the suit. Point of error twenty-two generally complains that the "trial court erred in finding as a fact that the Executrix voluntarily appeared and filed an answer in this proceeding."

In her initial pleadings, Mrs. Ashcraft originally sought relief against "the Estate of James Buford Ashcraft, III, Deceased." The citation issued against the "Estate" was served on Susie Ashcraft Pitts, Independent Executrix of the Estate of James Buford Ashcraft, III, Deceased. The Executrix filed an answer and thereafter, during the course of the trial, filed numerous other supplemental and amended pleadings wherein the introductory paragraph to such pleadings began: "NOW COMES Susie Ashcraft Pitts, Independent Executrix of

the Estate of James Buford Ashcraft, III, Deceased, and files for such Estate . . " In addition to answering Mrs. Ashcraft's suit, "Susie Ashcraft Pitts, Independent Executrix of the Estate of James Buford Ashcraft, III, Deceased," filed for such Estate an original "cross-action" and several supplemental and amended cross-actions seeking affirmative, declaratory, and injunctive relief, damages, and attorney's fees. In addition, the preamble of the written stipulations agreed upon by the parties and entered into evidence during the trial, stated as follows:

> "The following Stipulations are entered into by and between all parties hereto through their attorneys of record. The parties are Dorothy K. Ashcraft, Plaintiff; *Susie Ashcraft Pitts, as Independent Executrix of the Estate of James Buford Ashcraft, III, Deceased,* Defendant and Cross-Plaintiff; and the Intervenor, Kreidler-Ashcraft Funeral Directors, Inc. The parties stipulate as follows, to-wit: . . ."

The record before us indicates that Susie Ashcraft Pitts, in her representative capacity, also participated in pre-trial discovery and settlement negotiations with Mrs. Ashcraft. Susie Ashcraft Pitts, as Independent Executrix, appeared at the trial and was represented by counsel to pursue affirmative relief on behalf of the Estate as discussed in part herein. The trial of the case took several days to complete, and the statement of facts of the transcribed proceedings as contained in seven volumes comprise over 1,000 pages. After the evidence closed, the trial judge sent to each party a proposed judgment indicating his intention to enter judgment in favor of Mrs. Ashcraft and against the Executrix in her representative capacity.

Thereafter, for the first time, "Susie Ashcraft Pitts, Independent Executrix of the Estate of James Buford Ashcraft, III, Deceased," filed her objections to the entry of such judgment on the basis that Susie Ashcraft Pitts, Independent Executrix of the Estate "is not and has never been a defendant in the above entitled and numbered cause."

Appellant's major argument in support of these points of error is that Mrs. Ashcraft's post-trial amendment to her pleadings contravened the express provisions of Rule 41, Texas Rules of Civil Procedure, which allows an amendment to the pleadings joining a party to the suit only up to the time of submission of the case to the trial judge, where the trial is without a jury.

■■■■ We recognize the well settled rule that the "Estate" of a decedent is not a legal entity and may not sue or be sued as such. *Price v. Estate of Anderson,* 522 S.W.2d 690, 691 (Tex.Sup.1975). It has been generally stated that the mistake of filing a suit against an "estate" is not a mistake of fact concerning the correct name of the party intended to be sued, but rather, is a mistake of law concerning the party that should be sued to establish the liability of a decedent and collect the claim of the property belonging to his estate. *Price v. Estate of Anderson,* 522 S.W.2d 690, 692 (Tex.Sup.1975). Nevertheless, we are of the opinion that the express provisions of Rule 41 did not preclude the trial judge from permitting Mrs. Ashcraft to file a post-submission amendment to her pleadings in this case. This not the usual Rule 41 nonjoinder situation involving an estate where suit is brought against the "estate" alone and the official representative either does not appear or does not purport to participate as the representative of the estate after an appearance in another capacity has been made. Compare *Scott v. Graham,* 156 Tex. 97, 292 S.W.2d 324 (1956); *Gray v. Bush,* 430 S.W.2d 258 (Tex.Civ.App. —Fort Worth 1968, writ ref'd, n.r.e.); *Hortenstine v. Jackson,* 289 S.W.2d 613 (Tex. Civ.App.—Amarillo 1956, writ ref'd, n.r.e.).

■■■ The procedural rules give the trial court broad discretion in matters of joinder of parties, severance, separate trials, and consolidation of actions, and the trial court's action in that regard will not be disturbed on appeal except for an abuse of discretion. *Royal Petroleum Corp. v. Dennis,* 160 Tex. 392, 332 S.W.2d 313 (1960); Rules 41, 66, 90 Texas Rules of Civil Procedure; *Lambert v. H. Molsen & Co., Inc.,* 551

S.W.2d 151 (Tex.Civ.App.—Waco 1977, writ ref'd, n.r.e.); *Cruz v. Guajardo*, 502 S.W.2d 610 (Tex.Civ.App.—Corpus Christi 1973, no writ).

It is clear to us that the Executrix waived any complaint that she might have. She appeared in her capacity as official representative of the Estate and sought affirmative relief on behalf of the Estate against Mrs. Ashcraft. The Executrix was before the court in her official representative capacity. This was admitted as a fact by the terms of the stipulations, which were mutually agreed upon by all of the parties. The record demonstrates that the Executrix, in her representative capacity, participated fully in all stages of the proceedings. She now makes no attempt to show that the trial court's action in allowing such an amendment was a surprise or otherwise harmed her in any way. We conclude that, under the facts and circumstances of this case, it was quite proper for the trial judge, and it was within his sound discretion, to determine that an amendment should be permitted prior to judgment naming as defendant the Executrix in her representative capacity for the Estate. If there was any error, it was harmless. Rule 434, T.R.C.P. Points of error twenty-one and twenty-two are overruled.

The judgment of the trial court is affirmed.